UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOSEPH MSAYS, | : | Civil Action |
| | : | |
| Plaintiff, | : | Case No. _____ |
| | : | |
| v. | : | |
| | : | |
| INTERNATIONAL BUSINESS | : | |
| MACHINES CORPORATION, | : | |
| | : | |
| Defendant. | : | March 18, 2026 |

## **COMPLAINT**

Plaintiff Joseph Msays, for his complaint against Defendant International Business

Machines Corporation, alleges as follows:

## **NATURE OF THE ACTION**

1.     This is an action seeking damages based on Defendant's discriminatory practices

in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA"),

Title VII of the Civil Rights Act of 1963, 42 U.S.C. 2000e ("Title VII"), Section 1981 of the

Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), and the Connecticut Fair

Employment Practices Act, Connecticut General Statutes § 46a-51, *et seq.* ("CFEPA").

Beginning in 2012, Defendant undertook systemic efforts to terminate older employees

disproportionately to its younger employees, to exclude older employees from filling open

positions, and used other tactics targeting its older employees in an effort to create a significantly

younger workforce.  This conduct is ongoing to this day and constitutes unlawful discrimination

under the ADEA and CFEPA.  Plaintiff, as an older employee, was treated less favorably than

his younger peers and, as a result of a concerted corporate policy to create a "younger"

workforce, was denied employment opportunities. Defendant also discriminated against Plaintiff

due to his national origin (Lebanese, or, more specifically, <u>not</u> Asian), as a result of which he also was denied employment opportunities. This conduct is ongoing to this day and constitutes unlawful discrimination under Title VII, Section 1981, and CFEPA.

### PARTIES

2.      Plaintiff Joseph Msays is an individual residing in Ridgefield, Connecticut. Plaintiff has worked for IBM for over 34 years.  During that time, Plaintiff was denied the opportunity to advance to higher-level positions in the company despite being more than qualified for the positions by reason of education, training, experience and tenure. The advanced positions instead were given to IBM colleagues who were younger and/or of a favored national origin.

3.      Defendant International Business Machines Corporation ("IBM") is a New York corporation with its principal place of business located in Armonk, New York. IBM provides technology services and equipment, including computing, cloud services, software, hardware, artificial intelligence, and consulting, to customers around the world. IBM employs roughly 275,000 employees and ranked number 35 on the 2025 Fortune 500 rankings of the largest United States corporations by total revenue. IBM does business in the State of Connecticut and, at all times relevant to this Complaint, maintained local offices in Southbury, Connecticut.

### JURISDICTION AND VENUE

4.      Jurisdiction over the subject matter of this litigation exists pursuant to 28 U.S.C. §1331 as Plaintiff asserts claims under the ADEA, Title VII, and Section 1981.  As to those claims not arising under federal law but clearly so related to the claims in this action within the original jurisdiction of this Court, jurisdiction exists under the doctrine of supplemental jurisdiction as codified in 28 U.S.C. §1367, as well as due to diversity of citizenship pursuant to

28 U.S.C. §1332 in that the action involves citizens of different states and the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

5.　　Venue is proper in this District pursuant to 28 U.S.C. §§1391(b)(2) as the unlawful conduct giving rise to Plaintiff's claims took place within the District of Connecticut.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

6.　　Plaintiff timely filed administrative charges of discrimination and retaliation with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the Equal Employment Opportunity Commission ("EEOC").　Plaintiff has received Release of Jurisdiction letters from the CHRO dated January 10 and 12, 2026 (copies attached as Exhibits A and B), and Right to Sue letters from the EEOC dated February 2, 2026 (copies attached as Exhibits C and D).

## FACTUAL ALLEGATIONS

**A.　Plaintiff's Professional Career with IBM**

7.　　Plaintiff is a white Lebanese-American. He is 65 years old and has been employed by IBM for over 34 years.

8.　　Plaintiff was 29 years old when he began employment in 1989 as a worldwide digital communications architect in IBM's Systems Integration Division. Plaintiff held varying roles in different divisions until 1994, when IBM sold the division in which Plaintiff worked. After a brief respite, Plaintiff resumed employment with IBM in 1996 in its World Trade Division.

9.　　During the course of his employment, Plaintiff has worked in various capacities with important management and leadership responsibilities.

10. Plaintiff has been a productive and successful employee and his performance routinely met or exceeded IBM's expectations.

11. Plaintiff's primary role with IBM has been in IBM's consulting business unit ("IBM Consulting"), which provides consulting services on a broad range of products and services to a diverse client group.

12. Plaintiff has worked for IBM both in the United States and abroad as an expat employee. Plaintiff's international experience was acquired as a result of expat assignments over 16 years in several high-visibility, challenging, and productive senior international assignment positions in which he successfully drove the IBM consulting and IT services business. These international assignments in general management and/or executive capacity included the following:

(a) Singapore (approximately 32 months);

(b) Sweden (approximately 30 months);

(c) France (approximately 26 months);

(d) China (approximately 48 months);

(e) United Arab Emirates (approximately 48 months);

(f) Mexico (approximately 9 months); and

(g) Canada (approximately 6 months).

13. Plaintiff held leadership positions with IBM Consulting in many markets around the world, including the following:

(a) The Association of Southeast Asian Nations and South Asia ("ASEAN/SA") for more than 3.5 years for IBM Consulting;

(b) Nordic Market for more than 2.5 years for IBM Consulting;

(c) Asia Pacific for 4 years for IBM Strategic Outsourcing;

(d)    Central and Eastern Europe, Middle East, and Africa ("CEEMEA") for two years for IBM Strategic Outsourcing; and

(e)    Middle East and Africa ("MEA") for two years for IBM Strategic Sales.

14.    Plaintiff travelled extensively for IBM, consulting with clients and/or leading IBM employees in approximately 60 countries.

15.    Plaintiff also provided leadership on some of the largest and most prominent IBM deals ranging from the tens to hundreds of millions of dollars, including deals with both public and private clients in over 16 African nations (among them Burkina Faso, Ghana, Kenya, Malawi, Nigeria, and South Africa), as well as Australia, Austria, Finland, France, Germany, India, Japan, Mexico, Norway, China, South Korea, and Sweden.

16.    During the course of his career, Plaintiff consistently received positive evaluations of his work performance.

17.    It is common knowledge to Plaintiff's colleagues, supervisors, and subordinates that he is Lebanese-American. He has identified himself as such in internal company directories, and has stated that he speaks Arabic. Plaintiff also is a member of the "Arab-North-American-at-IBM" Business Resource Group ("BRG") (a company-sponsored organization aligned to IBM's business objectives and strategic Diversity & Inclusion priorities), which maintains an internal Slack channel for its community.

**B.    IBM Denies Plaintiff Advancement Opportunities Because of His Age and National Origin**

18.    IBM uses a "band" job classification system to define an employee's role, required skills, and salary range based on their level of responsibility and experience.  Executive-level roles are classified using letter bands from D to A, with A representing a position requiring greater experience and offering greater responsibility.

19. Plaintiff last received a Band-level promotion (from Band D to Band C) in 2004. Band C is a high-level executive role typically associated with senior leadership and management positions such as vice president. Band B is a higher-level general manager executive role that typically requires global and/or large market responsibilities with significant contributions to the success of IBM.   The specific responsibilities and exact title can vary depending on the specific role, but they generally involve leading a team or acting as a senior specialist within a technical or business domain, earning a significant portion of executive compensation in the form of higher total target cash (base salary and annual bonus) and higher long-term incentives (restricted stock units, stock options, and performance stock units), with performance stock units typically reserved for Band B and above.

20. While Plaintiff has received significant additional global responsibilities since 2015, on three occasions he was been passed over for promotions to Band B that instead were given to Asian counterparts: (1) to a male of Indian descent (under Mr. Shai Joshi and Mr. John Granger for a North America role); (2) to a male of Indian descent (under Mr. Shai Joshi and Mr. John Granger for a global role, with the decision described the night before as approved and assured, however  the Indian male candidate the next day was unexpectedly removed from consideration by the IBM Consulting Global Board); and (3) to a female of Taiwanese descent (under Mr. Shai Joshi and Mr. John Granger for a global role).

21. Beginning in or about 2012, when Plaintiff was 52 years old -- and in line with its ageist preference for "early professionals" over "dinobabies," see Paragraph 88, below -- IBM began to obstruct Plaintiff's career opportunities and compensation.

22. In February of 2013, while he was based in Dubai, UAE and serving IBM in the Middle East and Africa, Plaintiff initiated an internal grievance procedure following his receipt

of a poor (and false) performance evaluation for 2012. IBM retaliated against Plaintiff by abruptly repatriating him to the United States with no assigned domestic position.

23. In April 2015, Plaintiff attended a training conference in Atlanta, Georgia, organized by IBM's Application Development & Innovation ("AD&I") division. At a dinner event, the division's Global Managing Partner (who was one level removed from IBM's CEO and with whom Plaintiff had worked in the past) was seated at a table with handpicked younger future leaders. When Plaintiff (then 54 years old) approached the dinner table with one of his older colleagues to greet him,  the Global Managing Partner's first comment was, "here come the two dinosaurs," a term that was widely used inside IBM to describe unwanted older workers, similar to terms like "dinobabies" and others that were reported in the EEOC's findings following its age discrimination investigation of IBM practices.

24. In 2021, Plaintiff led the global Enterprise Applications Managed Services ("Global EA Managed Services") business, which reported to the head of Global Hybrid Cloud Management ("Global HCM"). At the time, Global EA Managed Services represented approximately 9% of IBM Consulting's revenues.

25. Plaintiff assumed responsibility for IBM's Managed Services business unit in the first quarter of 2021.  Despite a declining or low single-digit growth trend in the global HCM market for the three-year period from 2021 to 2023, Plaintiff's Managed Services business unit achieved "cumulative growth" (a term commonly used by economists to measure total percentage increase in value over a specific, multi-year period) of 42%.  This represented a very significant gain in market share and substantially outperformed IBM Consulting results and IBM company-wide results for the same period.

26.    In 2022, Plaintiff was overlooked for a promotion to Strategic Sales in IBM Consulting, in favor of a younger Asian candidate (Taiwanese-American), although Plaintiff clearly was more experienced and better qualified for the position. After this 2022 decision, it became obvious to Plaintiff that he was being subjected to age and national origin discrimination.

27.    Despite having no viable internal path for remediation, and with some encouraging statements from his immediate supervisor (Ms. Thais Lima de Marca), Plaintiff nevertheless decided to focus on 2023 and to deliver even stronger results in hope of securing a promotion to Band B.

28.    Mr. Shai Joshi, the Global Hybrid Cloud Services ("Global HCS") leader, acting as a proxy for Mr. John Granger (IBM Consulting Senior Vice President), aggressively attempted to recruit Plaintiff to live and work in Saudi Arabia in late 2022.  At the time IBM had identified Saudi Arabia (an Arabic-speaking nation) as one of its Top 4 focused growth markets, and engaged in a company-wide effort to move talent -- especially Arab-Americans employees -- to Saudi Arabia

C.    **IBM Denies Plaintiff the Global HCM Leader Position**

29.    In March 2023, a promotional opportunity opened to replace Plaintiff's immediate supervisor (Ms. Marca) in her Global HCM leader role.

30.    The Global HCM leader role would have been a natural progression from Plaintiff's then-current Global EA Managed Services leader role, in which he had excelled.

31.    On April 24, 2023, with Ms. Marca's recommendation and encouragement, Plaintiff interviewed for the Global HCM leader position with Mr. Shai Joshi, the Global HCS leader.

32.    On June 19, 2023, Mr. Joshi, who is of Indian descent, was replaced in his role by Mr. Varun Bijlani, also of Indian descent, who worked for Mr. Joshi and was a peer to Ms. Marca.

33.    The successful Global HCM candidate was expected to be announced on or before July 1, 2023, as it is unusual for IBM to leave vacant a position overseeing a multi-billion-dollar business.

34.    On July 19, 2023, Mr. John Granger, IBM Consulting Senior Vice President, announced to all IBM Consulting personnel that "HCT and HCM (global) leaders will be announced later in 3Q."

35.    From April 24, 2023 to January 4, 2024, all of Plaintiff's inquiries concerning the Global HCM leader position were met with silence. Emails from Plaintiff to Mr. Granger, IBM's Human Resource personnel (Mr. Stephen Kelly and Ms. Aparna Nair, who is of Indian descent), and Plaintiff's newly-appointed leader (Mr. Varun Bijlani), were ignored and all additional attempts by Plaintiff to obtain additional information went unanswered.

36.    On January 4, 2024, Mr. Bijlani informed Plaintiff of two decisions: (a) Plaintiff was not selected for the Global HCM leader role, which was instead awarded to Mr. Kamal Singhani, a younger, less-experienced Asian employee of Indian descent; and (b) Plaintiff would not be promoted for any role in 2024.

37.    Plaintiff told Mr. Bijlani that he believed he was being denied a promotion and otherwise discriminated against because he was not of Indian descent and because of his age.

38.    Plaintiff specifically told Mr. Bijlani that he thought Mr. Bijlani's selection of Mr. Singhani was the product of age and national origin discrimination.

39.     The sole justification Plaintiff received from Mr. Bijlani for failing to promote Plaintiff was a false narrative about Plaintiff not being sufficiently collaborative. Mr. Bijlani's rationale was a discriminatory pretext.

40.     The new Global HCS organization that Mr. Bijlani assembled in 2024 was comprised almost entirely of leaders who were Asians of Indian descent. For instance, the other important role in Mr. Bijlani's organization (Global HCT) was awarded at or about the same time (on or around January 10, 2024) to Mr. Shawn D'Souza, a younger, less-experienced employee who was Asian of Indian descent. As of April 2024, nine out of 10 of Mr. Bijlani's direct reports were Asian of Indian descent. The only exception was Mr. Bijlani's executive assistant, who held a temporary training role for future career advancement.

41.     IBM discriminated against Plaintiff by denying him the opportunity to become the Global HCM leader in January of 2024.

42.     Rather than promote Plaintiff to the open position he had earned, in or about mid-January 2024, Mr. Bijlani offered Plaintiff a lateral staff role. Because this role would have marginalized Plaintiff, he declined the lateral offer.

43.     In April 2024, Plaintiff spoke with Mr. Joshi (the Global HCS leader) at IBM's headquarters in Armonk, New York. Plaintiff asked Mr. Joshi (one of the decision-makers for the Global HCM leader role) why he had not supported him for the position. Mr. Joshi responded, in substance if not verbatim, "Considering where you are in your career, I thought you would care more about a salary increase than a promotion." Plaintiff responded by stating that both salary and promotion were important to him -- the salary because of years of pay inequity, and the promotion because of earned recognition. Plaintiff further stated that the salary increase occurred off annual cycle because Plaintiff had learned and complained that he was

being paid less than younger and more junior Indian colleagues recently transferred from India under H-1B visas.

**D.      Plaintiff's Performance Was Objectively Superior and Warranted a Promotion**

44.      When Mr. Bijlani and his superior (Mr. Granger) selected Mr. Singhani over Plaintiff for the Global HCM leader role in late 2023, the domestic Indian business that Mr. Singhani oversaw was the focus of an internal business control investigation concerning inflated financial results.

45.      Mr. Bijlani and/or his superior Mr. Granger were aware of the investigation into Mr. Singhani's team when they selected Mr. Singhani over Plaintiff for the Global HCM leader role.

46.      At the time Mr. Singhani was selected for the Global HCM leader role, the preliminary results of the investigation indicated significant wrongdoing within Mr. Singhani's organization.

47.      In or about August 2024, that investigation concluded that three senior leaders on Mr. Singhani's team had been inflating the India unit's financial results. The investigation resulted in the termination of two senior leaders (one of whom reported directly to Mr. Singhani) and the demotion of a third senior leader.

48.      In the fourth quarter of 2023 -- when IBM externally reported that its corporate revenue grew at 3%, IBM Consulting's revenue at 5%, and Application Operations' revenue at 6% -- Plaintiff's Global EA Managed Services, which is part of Application Operations, grew at 11% as reported internally.

49.      In or about February 2024, IBM arbitrarily removed one of the largest programs (with the US Federal Government) in Global EA Managed Services from Plaintiff's achieved

results and historic numbers, which artificially reduced his retrospective financial results for 2021, 2022 and 2023.

50.    Even if this retroactive change were considered, Plaintiff's performance was still stellar. After this unsupported reporting alteration, which Mr. Bijlani agreed to and approved, Plaintiff's Global EA Managed Services business at IBM cumulatively increased by 33% from the first quarter of 2021 to the fourth quarter of 2023. This growth, which is mostly organic (i.e., no assist from newly-acquired companies), was larger than that of IBM Corporation, IBM Consulting. and Application Operations over the same time period.

51.    In addition to the success of, Global EA Managed Services, Plaintiff oversaw received many industry recognitions and became a market-maker in many sought-after offerings, such as SAP (RISE and non-RISE), Salesforce, Oracle, and Maximo. The business growth Plaintiff led had a synergistic effect on IBM's other sales.

52.    Plaintiff's subordinates consistently demonstrated their superior motivation and positive outlook in IBM's annual engagement surveys, further demonstrating Plaintiff's leadership abilities.

53.    Plaintiff succeeded in his Global EA Managed Services role in part due is his extensive, high-visibility, challenging, and successful international experience and proven track record with clients and IBMers alike.

**E.    Plaintiff Is Subjected to Further Discrimination and Retaliation**

**(i)    Plaintiff is Given a Poor Evaluation**

54.    In April 2024, Plaintiff filed Complaints with the CHRO and the EEOC concerning IBM's discriminatory failure to promote him to the Global HCM leader role.

12

55.     After Plaintiff raised his discrimination claim with Mr. Bijlani on January 4, 2024, and following the filing of his discrimination Complaints in April 2024. IBM has retaliated against Plaintiff in a variety of ways.

56.     Although Mr. Bijlani was Plaintiff's supervisor only for the second half of 2023, in late February 2024, Mr. Bijlani retaliated against Plaintiff by giving him an average performance rating for the full year of 2023 and a mediocre yearly executive compensation package. The 2023 rating directly contradicted the exceptional performance rating Plaintiff received for the first half of 2023 from Mr. Bijlani's predecessor (Ms. Marca). Mr. Bijlani's performance rating and compensation package failed to account for Plaintiff's objectively outstanding job performance when compared to his peers or to Plaintiff's own 2022 performance rating and executive compensation.

57.     Contrary to IBM's standard procedure, Mr. Bijlani failed to record Plaintiff's evaluation for the full year of 2023 in IBM's HR employee portal.

**(ii)     Plaintiff is Demoted and Further Isolated and Humiliated**

58.     IBM further retaliated against Plaintiff in late June or early July 2024.  At that time, and under the direction and supervision of Mr. Bijlani's HR Leader (Ms. Nair), Plaintiff learned that he had become the focus of an internal IBM process called "running the slate," which involves creating a list of potential replacements for an executive who IBM intends to terminate or reassign due to poor performance, business control investigations, or other alleged malfeasance or misfeasance.

59.     The decision to "run the slate" on Plaintiff was an indicator to the IBM senior executives that Plaintiff was not secure in his position.

60.     IBM then further retaliated against Plaintiff by demoting him.

61.    On October 24, 2024, IBM announced a significant reorganization across IBM Consulting.

62.    As part of this reorganization, IBM announced that Plaintiff's position, Enterprise Applications Managed Services, which IBM HR classifies as a Service Area, was to be eliminated.

63.    Three days before the announcement, Plaintiff was offered the choice of resigning or accepting a demotion where he would assume the duties of one of his subordinates for a single "Offering" (IBM's term for a separate line of consulting business), rather than his prior position of supervising three "Offerings," also known as Service Area. Rather than resign, Plaintiff chose to accept the demotion.

64.    Ordinarily at IBM, when an employee is being transferred to a new supervisor, the current supervisor will inform the subordinates of the transfer, and the subordinates are then welcomed by the new supervisor.

65.    When two of Plaintiff's subordinates were assigned to a new supervisor during the October 2024 reorganization, however, IBM did not follow this practice. Instead, Plaintiff's subordinates were assigned in the HR system and in IBM Corporate Directory to Plaintiff's superior (Mr. Singhani) without advance notice to Plaintiff. This deviation from IBM's standard procedures created the impression that the transfers were the product of Plaintiff's poor performance.

66.    In contrast to Plaintiff's demotion, other executives at his level who were affected by the same reorganization were placed in lateral positions, assigned newly created roles that did not fit the reorganization construct, or were announced with the word "Acting" next to their titles.

14

67.     Plaintiff, non-Asian and the oldest executive within Mr. Bijlani's organization, was the only executive who received a functional demotion. As a result of the reorganization, 100% of Mr. Bijlani's direct leadership positions were held by Asians of Indian descent.

68.     Although IBM did not reduce Plaintiff's band or salary in October 2024, the demotion significantly reduced his future bonus opportunities, number of restricted stock units, number of stock options, and/or membership in global leadership teams.

69.     On March 11, 2025, despite Plaintiff's objectively outstanding performance, Plaintiff received no salary increase and a comparatively low bonus payment and equity compensation (restricted stock units and stock options). IBM ignored Plaintiff's requests for an explanation or justification for this action.

70.     On March 19, 2025, IBM removed Plaintiff from IBM Consulting's Global Leadership Team ("GLT"), which includes the top 100 leaders selected from a group of more than 150,000 IBM consultants.  Plaintiff had been a GLT member since January 16, 2023.  Mr. Bijlani's HR Leader (Ms. Nair) stated that Plaintiff was removed because GLT membership is predominantly role-based; however, Plaintiff's significant business size, contributions, and role clearly met this standard, and other IBM Consulting leaders with comparatively insignificant roles were admitted to or kept in the GLT. Plaintiff's appeal to Mr. Mohamad Ali (new SVP of IBM Consulting, of Indian descent, who replaced Mr. Granger) and Mr. Kelly (Mr. Ali's HR Partner and Ms. Nair's supervisor) were met with silence.

71.     On April 27, 2025, and under the direction of Mr. Bijlani's HR Leader (Ms. Nair), Plaintiff's entire organization was reshuffled and reconfigured, and some of his subordinates were transferred out of the organization, without any prior notice to or knowledge of either

Plaintiff or his subordinates. This was done contrary to IBM's standard practice and left Plaintiff with fewer subordinates reporting to him and with reduced job responsibilities.

72. In June of 2025, IBM excluded Plaintiff from a key, foundational account whose services business he had built from scratch over the preceding four years. Mr. Mohamad Ali (SVP of IBM Consulting) assigned to others an uncomplicated, brief (12 days start to finish) transaction on the account worth tens of millions of dollars and which previously would have been assigned to Plaintiff. The team Mr. Ali assembled intentionally failed to keep Plaintiff apprised of the transaction's negotiation progress, withheld details on the transaction, and prevented Plaintiff from receiving recognition for the transaction even though this account was an integral component of Plaintiff's business and financial results.

73. IBM engaged in the foregoing adverse employment actions because of Plaintiff's age and/or national origin and in retaliation for his engaging in statutorily-protected activity – the pursuit of civil rights claims with the CHRO and EEOC.

74. IBM subjected Plaintiff to one or more adverse actions on account of his age and/or national origin and/or prior opposition to discrimination.

75. Plaintiff was a target of age discrimination.

76. Had Plaintiff been younger, IBM would not have denied him advanced employment opportunities.

77. Plaintiff's age was a motivating factor in IBM's refusal to provide him advanced employment opportunities.

78. Had Plaintiff not been a Lebanese-American, but rather an Asian, IBM would not have denied him advanced employment opportunities.

79.     Plaintiff's national origin (Lebanese-American and not Asian) was a motivating factor in IBM's refusal to provide him advanced employment opportunities.

80.     As a result of IBM's unlawful conduct, Plaintiff has been denied appropriate raises, benefits, and promotions, causing him monetary and emotional distress.

**F.     IBM's Adoption and Execution of a Program of Discriminatory Bias against Older Workers**

81.     For well over a decade, IBM has developed and executed a systematic plan and program to remove older employees or to force them out of the company. In the process, IBM has eliminated tens of thousands of American employees ages 40 and over.

82.     In March of 2018, a nonprofit investigative website, ProPublica, published an article concerning the U.S. Equal Employment Opportunity Commission's large-scale investigation of IBM's discriminatory employment practices. See Peter Gosselin & Ariana Tobin, *Cutting "Old Heads" at IBM*, ProPublica (March 22, 2018), available at https://features.propublica.org/ibm/ibm-age-discrimination-american-workers/ (copy attached as Exhibit E).

83.     Following publication of the ProPublica article, the U.S. Equal Employment Opportunity Commission ("EEOC") conducted a lengthy and in-depth investigation of the complaints of many older IBM employees who were terminated between 2012 and 2018. On September 3, 2020, the EEOC issued a Determination (the "EEOC Determination") (copy attached as Exhibit F). Based on its analysis of statistical data and "corroborating testimony from dozens of witnesses nationwide," the EEOC found "reasonable cause to believe that [IBM] has discriminated against" older IBM workers because of their age. Id.

17

84.    The EEOC further found that termination of employees through group layoffs between 2013 and 2018 was part of a systemic and long-term plan devised by top management to replace older workers with younger career hires. The EEOC's investigation concluded that IBM's mass layoffs had an "adverse impact" on employees ages 40 and over, and it "uncovered top-down messaging from [IBM]'s highest ranks directing managers to engage in an aggressive approach to significantly reduce the headcount of older workers to make room for Early Professional Hires." Id.

85.    The EEOC's investigation concluded that IBM's explanation for its layoff decisions disproportionately affecting older employees "[did] not withstand scrutiny." Id.

86.    On May 17, 2018, ProPublica issued a companion article focusing on the EEOC's investigation of IBM's discriminatory practices. See Peter Gosselin, *Federal Watchdog Launches Investigation of Age Bias at IBM*, ProPublica (May 17, 2018), available at https://www.propublica.org/article/federal-watchdog-launchesinvestigation-of-age-bias-at-ibm (copy attached as Exhibit G).

87.    Additional evidence compiled since the 2018 ProPublica articles and the 2020 EEOC Determination provides incontrovertible proof that IBM historically has engaged in a company-wide and company-sanctioned pattern of age discrimination, as noted by several courts who have refused efforts by IBM to seal from public view a myriad of supporting documents evidencing such age discrimination.  For example, in Lohnn v. IBM, 2022 WL 36420, at *12 (S.D.N.Y. Jan. 4, 2002), the court listed the following evidence of ageism that IBM sought to conceal from the public:

- Communications between high-level IBM executives in which they discussed how the percentage of millennials employed at IBM trailed that of competitor firms, used a disparaging term to describe older IBM employees, and described layoffs that would help change the age distribution of employees at IBM;

- Corporate planning documents that set forth hiring and workforce composition goals including a focus on hiring early professionals to correct the seniority mix and that discussed a strategic relocation program that was allegedly used to ensure the resignation of older employees from the company;

- Documents and data produced by IBM to the EEOC regarding layoffs and related matters that resulted in an unfavorable finding by the EEOC;

- Testimony from high-level executives in various arbitrations related to "reskilling" IBM's workforce, IBM's focus on attracting early professional hires, the availability of age demographic information regarding the company's layoffs, and the practice of requiring additional approval for laid-off employees to obtain other open positions at IBM; and

- Demographic data on layoffs in a particular business unit within IBM that Plaintiff's counsel's expert analyzed to determine that older employees were more than twice as likely to be selected for termination than younger employees.

**G.      IBM's Ongoing Commitment to Make "Dinobabies" an "Extinct Species"**

88.      Top executives at IBM emailed one another about "a plan to 'accelerate change by inviting the 'dinobabies' (new species) to leave' and make them an 'extinct species.'" Noam Scheiber, "*Making 'Dinobabies' Extinct: IBM's Push for a Younger Work Force,*" New York Times (Feb. 12, 2022), available at https://www.nytimes.com/2022/02/12/business/economy/ibmage-discrimination.html. (copy attached as Exhibit H).

89.      Claimants in other court cases and arbitrations against IBM have uncovered similarly-direct incriminating evidence of age discrimination at IBM and the targeting of older employees in the form of executive emails, including the following:

- IBM executives exchanged emails making clear IBM wanted to see the percentage of "millennials" employed at IBM increased.

- In one email chain, an IBM executive expresses frustration that IBM's proportion of millennials employees is much lower than at a competitor firm. She forwards an article to another executive, which she points out "says 72% of ACN ee's are millenials [sic]." The recipient of the email responds, stating

"Last year, millennials made up 42% of our workforce and 81% of new hires . . . . we can refresh the numbers for YTD 2016-and see what makes sense to use in future opps." The IBM executive replies: "42 is a far cry from 72."

- These emails show an IBM executive making clear concerns to her Human Resources team, noting to her team: "at the last OT we discussed the fact that our millennial population trails competitors. The data below is very sensitive -- not to be shared -- but wanted to make sure you have it. You will see that while Accenture is 72% millennial we are at 42% with a wide range and many units falling well below that average. Speaks to the need to hire early professionals – and to avoid using downbanding of existing employees as a way to fill jobs. Honestly I think we should stop this practice – it means overpaying, creates blockers and inhibits bringing in new thinking from the outside."

- Indeed, the withheld emails show that IBM was particularly focused on an analysis of the percentage of millennials in each business united at IBM.

- An IBM analysis reflected in these emails includes a chart which shows the percentage of employees in various generational cohorts in each business unit. These cohorts identify the proportion of employees who are "millennial," "Gen X," "baby boomers," and "traditionalists."

- In another communication, an IBM executive applauds the use of the disparaging term "Dinobabies" to describe the older IBM employees and a plan to "accelerate change by inviting the dinobabies" (new species) to leave" and make them an "Extinct species."

- In another email, an IBM executive describes IBM's "*dated* maternal *workforce -- this is what must change*. They really don't understand social or engagement. Not digital natives. *A real threat for us*." (Emphasis added).

- In one email, an IBM executive warns her team: "I'm sure you all know this but as a reminder, keep data on age very limited and when in doubt check with legal."

- These emails evidence a top-down plan to retain younger workers in an effort to improve IBM's demographic makeup. In one email, an IBM executive explains a "mandatory" rule that "no EPH [Early Professional Hire] is eligible for RA ["resource action" – IBM's term for mass layoff] in first 12 months of hire. We are not making the progress we need to make demographically, and we are squandering our investment in talent acquisition and training."

- In another email, an IBM executive explains that the percentage of millennials at IBM will increase once certain of IBM's "resource action" (layoff) programs are complete: " – more on this issue of % millennials. The math will

20

improve when [laid off] employees move on, and when we bring onboard our early professionals and interns in the summer . . ..”

Plaintiff's Reply in Support of Motion to Vacate and Opposition to IBM's Motion to Confirm Arbitration Award dated April 2, 2022, Laudig V. IBM, No. 1:21-cv-05033-AT (S.D.N.Y April 1, 2022), ECF No. 22 at 10-11 (copy attached as Exhibit I).

90.     A federal court has ruled that "internal IBM corporate planning documents" provide a reasonable basis to find that "IBM executives sought to lay off older workers in an effort to hire a younger workforce." Langley v. IBM, No. 1:18-CV-00443-DAE, 2020 WL 8052973 at * 4 (W.D. Tex. Feb. 28, 2020).

91.     The Langley court specifically found that the "abundant public and internal statements of IBM's CEO and CFO in promoting the company's need to 'refresh' its workforce" provide a reasonable basis to believe that lower-level managers "were following company directives when directing their own subordinates where to cut costs…." Id.

92.     The Langley court further concluded that internal IBM documents "suggest that high level IBM executives were encouraging managers to lay off workers … to make room for younger employees." Langley v. IBM. No. 1:18-CV-00443-DAE, 2019 WL 1162423 at * 4 (W.D. Tex. Dec. 23, 2019).

93.     Some of the evidence relied on by the Langley court included documents describing corporate objectives as "[i]ncreas[ing] early professional hiring"; comparing year-over-year hiring of "early professionals" in a department and suggesting how to increase the percentage of early professional hires; and setting a policy excluding early professional hires from Resource Actions. Id. at * 4, n. 5.

94.     The Langley court held that IBM documents provided a reasonable basis for a jury to find that IBM's alleged decision-maker "was in fact effectively told whom to lay off."

Further, the court found that managers were required to meet "headcount" quotas that favored hiring younger workers and disfavored retaining or rehiring older workers. Langley, 2020 WL 8052973 at ** 4-5.

95.    Another court scrutinized documents IBM withheld from discovery and determined that they were "directly relevant" to nearly identical age discrimination claims. See Lohan v. IBM, No. 21-CV-637 (LJL), 2022 WL 36420 at *12 (S.D.N.Y. Jan. 4, 2022). The Lohan court concluded that IBM documents "on their face appear to show an effort to remove older employees in favor of younger employees." Id. at *6.

96.    On information and belief, IBM's systematic replacement of older employees with much younger workers has continued to the present. In an effort to rebrand its image and shift its recruiting focus to "Millennials" (i.e., people born between 1980 and 1996), IBM carried out a company-wide scheme to discharge older workers through group terminations, known at IBM as "Resource Actions."

97.    On information and belief, to effectuate its discriminatory scheme to replace older workers with younger workers, IBM (a) directed its managers to give lower performance evaluation scores and take other adverse actions against older workers in order to provide a purported basis on which to select those workers for termination via Resource Actions; (b) exempted or protected from layoff "early professionals" and recent college graduates, who are much younger than the average IBM employee; and (c) took affirmative steps to keep its workforce and the public in the dark about its discriminatory practices, including falsely classifying Resource Action terminations as retirements or performance-based terminations.

98.    IBM's plan to replace its older employees with much younger ones was implemented and achieved its apparent purpose. This longstanding, companywide campaign to

22

target, fail to promote, discharge, and replace older workers demonstrates that discrimination against older workers has been – and remains -- the standard operating procedure at IBM.

**H.      IBM's Flagrant and Willful Violation of Anti-Discrimination Laws**

99.      Despite the 2020 EEOC Determination and litigation addressing its corporate age discrimination program, IBM's willful violation of employment discrimination law continues to this day.   In addition to corporate policies encouraging discriminatory treatment of executives based on age and national origin, in recent years, IBM's top management has promulgated and engaged in race- and gender-based employment practices by means of a *de facto* quota system.

100.      IBM documented its goals and progress in implementing its race and sex-based balancing initiative in corporate documents.  See Int'l Bus. Mach. Corp., 2024 Notice of Annual Meeting and Proxy Statement 36 (2024) (available at https://perma.cc/FE9T-6BJ9); Int'l Bus. Mach. Corp., 2023 Annual Report 16 (2024) (available at https://perma.cc/Q7KC-PEK7); Int'l Bus. Mach. Corp., 2022 Annual Report 16 (2023) (available at https://perma.cc/5PX2-9L2W).

101.      Statements by high-ranking corporate officials confirm these goals. On December 11, 2023, an undercover video posted to the social media platform X showed IBM's Chief Executive Officer and Board Chairman, Arvind Krishna, discussing these discriminatory policies. See https://x.com/JamesOKeefeIII/status/1734374423124176944?s=20

102.      In the video (purportedly recorded in 2021), Krishna responds to questions about IBM's "diversity, equity, and inclusion" activity and the company's efforts to promote and recruit employees based on their skin color and sex.

103.      In the video, Krishna is asked about IBM's "progress in promoting and recruiting underrepresented minorities in executive roles and holding executives accountable for DE&I goals."  In his response, Krishna states that "all executives in the company have to move forward

23

by 1% on both underrepresented minorities … and gender. You've got to move both forward by a percentage." Id. at 7:49–8:06.

104.    Krishna further explained that if executives do that, "That leads to a plus on [their] bonus.  By the way, if you lose, you lose part of your bonus." Id. at 8:09–:15.

105.    Krishna admitted that IBM's recruitment of women was at 41% but that IBM intends to "get to the representational demographics of the underlying populations."  He then stated, "I am not trying to finesse this, so for blacks, we should try to get towards 13 point something percent.  On Hispanics, you got to get into the mid-teens.  On gender, okay, we are somewhere in the mid 30s, I think, for all of IBM.  But think, if I know this right, the representational is 50." Id. at 8:47–9:13.

106.    As shown in the video. IBM leadership admitted that the company reduced the pay of and even terminated executives who did not do enough to advance gender and racial quotas.  On the other hand, executives who followed the policy and engaged in race- and sex-based employment practices were rewarded financially.

107.    On information and belief, after these 2021 comments were made, the culture and pressure to advance race- and sex-based quotas only increased as IBM leadership ramped up efforts to "apply those deeper into the organization."

108.    As with IBM's decade-long age discrimination program, the quota system discussed by IBM's CEO was tied to bonus compensation in such a way that it incentivized impermissible racial and gender discrimination and disincentivized the refusal to engage in such discrimination.

24

## CLAIMS FOR RELIEF

**Count One – Age Discrimination in Violation of the ADEA, 29 U.S.C. §623(d)**

1-108.  Plaintiff hereby repeats and realleges Paragraphs 1 through 108 as if more fully set forth herein.

109.    Plaintiff was at all times relevant hereto an "employee" as that term is defined in 29 U.S.C. §630(f).

110.    IBM is an "employer" within the meaning of 29 U.S.C. §630(b).

111.    At all relevant times hereto, IBM employed more than 20 persons.

112.    IBM discriminated against plaintiff on the basis of age in violation of the ADEA, 29 U.S.C § 623(a).

113.    IBM's violation of the ADEA was knowing and willful.

114.    As a direct and proximate result of the IBM's conduct as set forth above, Plaintiff wrongfully has been denied appropriate promotions, salary increases, bonuses, and benefits, thereby sustaining significant economic and non-economic loss and damage, including, but not limited to, monetary damages and emotional distress.

**Count Two – Retaliation in Violation of the ADEA, 29 U.S.C. § 623(d)**

1-114.  Plaintiff hereby repeats and realleges Paragraphs 1 through 114 as if more fully set forth herein.

115.    IBM retaliated against Plaintiff because he engaged in conduct protected under the ADEA, and specifically, because he challenged the denial of promotions due to his age.

116.    As a direct and proximate result of the IBM's conduct as set forth above, Plaintiff wrongfully has been denied appropriate promotions, salary increases, bonuses, and benefits,

thereby sustaining significant economic and non-economic loss and damage, including, but not limited to, monetary damages and emotional distress.

**Count Three – Age Discrimination in Violation of CFEPA, Conn. Gen. Stat. §46A-60(a)**

1-108.  Plaintiff hereby repeats and realleges Paragraphs 1 through 108 as if more fully set forth herein.

109.    Plaintiff was at all times relevant hereto an "employee" as that term is defined in Connecticut General Statutes §46a-51(9).

110.    IBM is an "employer" as that term is defined in Connecticut General Statutes §46a-51(10).

111.    At all relevant times hereto, IBM employed more than one person.

112.    Defendant's conduct, by and through its agents, in treating Plaintiff in a manner unequal to other employees, discriminatorily denied Plaintiff equal treatment on the basis of his age in violation of C.G.S. §46a-60(b)(1).

113.    As a direct and proximate result of the IBM's conduct as set forth above, Plaintiff wrongfully has been denied appropriate promotions, salary increases, bonuses, and benefits, thereby sustaining significant economic and non-economic loss and damage, including, but not limited to, monetary damages and emotional distress.

**Count Four – Retaliation in Violation of CFEPA, Conn. Gen. Stat. § 46A-60(a)**

1-113.  Plaintiff hereby repeats and realleges Paragraphs 1 through 113 as if more fully set forth herein.

114.    IBM retaliated against Plaintiff because he engaged in conduct protected under CFEPA, and specifically, because he challenged the denial of promotions due to his age.

115.    As a direct and proximate result of the IBM's conduct as set forth above, Plaintiff wrongfully has been denied appropriate promotions, salary increases, bonuses, and benefits, thereby sustaining significant economic and non-economic loss and damage, including, but not limited to, monetary damages and emotional distress.

**Count Five - National Origin Discrimination in Violation of Title VII, 29 U.S.C. §2000e**

1-108.    Plaintiff hereby repeats and realleges Paragraphs 1-108 as if more fully set forth herein.

109.    IBM is an "employer" as defined by 42 U.S.C. §2000e(b).

110.    IBM, at all times relevant hereto, has employed more than 15 employees.

111.    IBM's conduct, by and through its agents, in treating Plaintiff in the manner aforesaid, discriminatorily denied Plaintiff equal treatment on the basis of sex, religion and national origin in violation of Title VII, as amended by the Civil Rights Act of 1991.

112.    IBM, in failing to adequately investigate and remedy the treatment to which Plaintiff was subjected, despite IBM's knowledge of the conduct, discriminatorily denied Plaintiff equal treatment on the basis of sex, religion and national origin in violation of Title VII.

113.    IBM subjected Plaintiff to illegal discrimination. Moreover, IBM unreasonably interfered with Plaintiff's work, and Plaintiff's complaints of discrimination were used by IBM as a basis for adverse employment decisions affecting him.

114.    As a direct and proximate result of the IBM's conduct as set forth above, Plaintiff wrongfully has been denied appropriate promotions, salary increases, bonuses, and benefits, thereby sustaining significant economic and non-economic loss and damage, including, but not limited to, monetary damages and emotional distress.

**Count Six –Retaliation in Violation of Title VII, 42 U.S.C. §2000e-3**

1-114. Plaintiff hereby repeats and realleges Paragraphs 1-114 as if more fully set forth herein.

115. The actions of IBM were taken in retaliation for Plaintiff's effort to protect her rights in violation of 42 U.S.C. §2000e-3, Title VII.

116. As a direct and proximate result of the IBM's conduct as set forth above, Plaintiff wrongfully has been denied appropriate promotions, salary increases, bonuses, and benefits, thereby sustaining significant economic and non-economic loss and damage, including, but not limited to, monetary damages and emotional distress.

**Count Seven -- National Origin Discrimination in Violation of Section 1981,**
**42 U.S.C. §1981, et seq.**

1-108. Plaintiff hereby repeats and realleges Paragraphs 1-108 as if more fully set forth herein.

109. IBM's conduct, in treating Plaintiff in the manner unequal to other employees on the basis of national origin, discriminatorily denied Plaintiff equal treatment in violation of 42 U.S.C. §1981.

110. IBM, in failing to adequately investigate and remedy the treatment to which Plaintiff was subjected, despite IBM's knowledge of the conduct, discriminatorily denied Plaintiff equal treatment on the basis of national origin in violation of 42 U.S.C. §1981.

111. The discriminatory acts of IBM as described above were intentional and were motivated on the basis of Plaintiff's national origin.

112. As a direct and proximate result of the IBM's conduct as set forth above, Plaintiff wrongfully has been denied appropriate promotions, salary increases, bonuses, and benefits,

thereby sustaining significant economic and non-economic loss and damage, including, but not limited to, monetary damages and emotional distress.

**Count Eight – Retaliation in Violation of Section 1981, 42 U.S.C. §1981, et seq.**

1-112. Plaintiff hereby repeats and realleges Paragraphs1-112 as if more fully set forth herein.

113.     IBM's conduct, in treating Plaintiff in a manner unequal to other employees on the basis of national origin, discriminatorily denied Plaintiff equal treatment on the basis of national origin in violation of 42 U.S.C. §1981.

114.     Moreover, once Plaintiff attempted to protect his right to equal treatment, IBM retaliated against him in violation of 42 U.S.C. §1981.

115.     The retaliatory acts of IBM as described above were intentional and were motivated on the basis of Plaintiff's national origin.

116.     As a direct and proximate result of the IBM's conduct as set forth above, Plaintiff wrongfully has been denied appropriate promotions, salary increases, bonuses, and benefits, thereby sustaining significant economic and non-economic loss and damage, including, but not limited to, monetary damages and emotional distress.

**Count Nine -- National Origin Discrimination in Violation of CFEPA,**
**                 Conn. Gen. Stat. §46a-60(a), et seq.**

1-108. Plaintiff hereby repeats and realleges Paragraphs 1-108 as if more fully set forth herein.

109.     Plaintiff was, at all times relevant hereto, an employee as that term is defined in Connecticut General Statutes §46a-51 (9).

110.     IBM is an employer as that term is defined in Connecticut General Statutes §46a-51(10).

29

111.    At all relevant times hereto, IBM employed more than one person.

112.    The acts of IBM as described above were motivated on the basis of Plaintiff's sex, religion, national origin and national origin in violation of Connecticut General Statutes §46a-60(a), *et seq.*

113.    Said discrimination was willful, and IBM had knowledge that the above-described acts were in violation of Connecticut General Statutes §46a-60(a), or had a reckless disregard for the provisions of said statute.

114.    As a direct and proximate result of the IBM's conduct, Plaintiff has suffered and will continue to suffer damages, including but not limited to substantial loss in earnings and loss of material employment benefits.

115.    As a direct and proximate result of the IBM's conduct as set forth above, Plaintiff wrongfully has been denied appropriate promotions, salary increases, bonuses, and benefits, thereby sustaining significant economic and non-economic loss and damage, including, but not limited to, monetary damages and emotional distress.

**Count Ten – Retaliation in Violation of CFEPA, Conn. Gen. Stat. §46a-60(4)**

1-115.  Plaintiff hereby repeats and realleges Paragraphs 1-115 as if more fully set forth herein.

116.    The actions of IBM were taken in retaliation for Plaintiff's protests and opposition to discriminatory employment practices and in an effort to protect his rights, in violation of Connecticut General Statutes §46a-60(4).

117.    As a result of IBM's conduct, Plaintiff has suffered and will continue to suffer past and future economic, physical and emotional harm.

30

118.    As a direct and proximate result of the IBM's conduct as set forth above, Plaintiff wrongfully has been denied appropriate promotions, salary increases, bonuses, and benefits, thereby sustaining significant economic and non-economic loss and damage, including, but not limited to, monetary damages and emotional distress.

WHEREFORE, Plaintiff Joseph Msays prays for the following relief:

1.      Compensatory economic damages, including back pay, bonuses, equity, and the value of all other employment benefits in an amount to be determined by the trier of fact, with interest from the date when such sums were due;

2.      Compensatory non-economic damages, including loss of enjoyment of life and emotional pain and suffering;

3.      Liquidated damages under the ADEA;

4.      Punitive damages;

5.      Attorneys' fees and costs;

6.      Prejudgment interest and costs; and

7.      Such other and further relief as this Court shall deem just and proper.


**Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.**


PLAINTIFF
JOSEPH MSAYS

By:      /s/ *Douglas J. Varga*
            Douglas J. Varga (CT18885)

Scott R. Lucas (CT00517)
LUCAS & VARGA LLC
2425 Post Road, Suite 200
Southport, CT 06890
Tel: (203) 227-8400
Fax: (203) 227-8402
E-Mail: dvarga@lucasvargalaw.com
            slucas@lucasvargawlaw.com

His Attorneys


32

**EXHIBIT A**

# STATE OF CONNECTICUT
# COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

__Joseph Msays.__
**COMPLAINANT**

                                                CHRO No. 2430736

vs.                                              EEOC No. 16A202401270

__IBM Corp.__
**RESPONDENT**

## RELEASE OF JURISDICTION

The Commission on Human Rights and Opportunities hereby releases its jurisdiction over the above-identified complaint. The Complainant is authorized to commence a civil action in accordance with CONN. GEN. STAT. § 46a-100 against the Respondent in the Superior Court for the judicial district in which the discriminatory practice is alleged to have occurred, in which the Respondent transacts business or in which the Complainant resides. If this action involves a state agency or official, it may be brought in the Superior Court for the judicial district of Hartford.

A copy of any civil action brought pursuant to this release must be served on the Commission at ROJ@ct.gov or at 450 Columbus Blvd., Suite 2, Hartford, CT 06103 at the same time all other parties are served. Electronic service is preferred. **THE COMMISSION MUST BE SERVED BECAUSE IT HAS A RIGHT TO INTERVENE IN ANY ACTION BASED ON A RELEASE OF JURISDICTION PURSUANT TO CONN. GEN. STAT. § 46a-103.**

The Complainant must bring an action in Superior Court within 90 days of receipt of this release and within two years of the date of filing the complaint with the Commission unless circumstances tolling the statute of limitations are present.

                                                       *Tanya A. Hughes*

**DATE:  January 10, 2026**           Tanya A. Hughes, Executive Director

cc:
     Complainant's Attorney: Douglas Varga, Esq.
                            dvarga@lucasvargalaw.com

     Respondent's Atty.:    Erika Cagney, Esq.
                            ecagney@jonesday.com
     Case File

**EXHIBIT B**

STATE OF CONNECTICUT
COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

Joseph Msays
**COMPLAINANT**

                                   CHRO No. 2530436

vs.                               EEOC No.  16A202500552

International Business Machines Corporation
**RESPONDENT**

### RELEASE OF JURISDICTION

The Commission on Human Rights and Opportunities hereby releases its jurisdiction over the above-identified complaint. The Complainant is authorized to commence a civil action in accordance with CONN. GEN. STAT. § 46a-100 against the Respondent in the Superior Court for the judicial district in which the discriminatory practice is alleged to have occurred, in which the Respondent transacts business or in which the Complainant resides. If this action involves a state agency or official, it may be brought in the Superior Court for the judicial district of Hartford.

A copy of any civil action brought pursuant to this release must be served on the Commission at ROJ@ct.gov or at 450 Columbus Blvd., Suite 2, Hartford, CT 06103 at the same time all other parties are served. Electronic service is preferred. **THE COMMISSION MUST BE SERVED BECAUSE IT HAS A RIGHT TO INTERVENE IN ANY ACTION BASED ON A RELEASE OF JURISDICTION PURSUANT TO CONN. GEN. STAT. § 46a-103.**

The Complainant must bring an action in Superior Court within 90 days of receipt of this release and within two years of the date of filing the complaint with the Commission unless circumstances tolling the statute of limitations are present.

*Tanya A. Hughes*
_____
**DATE:**  January 12, 2026         Tanya A. Hughes, Executive Director

Service:
Complainant: joseph.msays@gmail.com
Complainant's attorney:  dvarga@lucasvargalaw.com
Respondent:  IBM
Respondent's attorney: ecagney@jonesday.com

**EXHIBIT C**

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

New York District Office
33 Whitehall St, 5th Floor
New York, NY 10004
(929) 506-5270
Website: www.eeoc.gov

## NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 02/02/2026

**To:** Joseph Msays
80 Old South Salem Rd
Ridgefield, CT 06877
Charge No: 16A-2024-01270

EEOC Representative and email:    DARLAN BASTIDAS
SUPERVISORY INVESTIGATOR
DARLAN.BASTIDAS@EEOC.GOV

---

### NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

The EEOC has granted your request for a Notice of Right to Sue, and more than 180 days have passed since the filing of this charge.

The EEOC is terminating its processing of this charge. The EEOC is closing your case. Therefore, your lawsuit under the ADEA must be filed in federal or state court WITHIN 90 DAYS of your receipt of the EEOC's official notice of dismissal. Otherwise, your right to sue based on the above-numbered charge will be lost.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice that the EEOC has dismissed your charge and has issued you notice of your right to sue the respondent(s) on this charge. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of EEOC's official notice of dismissal.** You should keep a record of the date you received the EEOC's official notice of dismissal. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission,

Digitally Signed By:Arlean Nieto
02/02/2026

Arlean Nieto
Acting District Director

**EXHIBIT D**



# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**New York District Office**
33 Whitehall St, 5th Floor
New York, NY 10004
(929) 506-5270
Website: www.eeoc.gov

## NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 02/02/2026

**To:** Joseph  Msays
80 Old South Salem Rd
Ridgefield, CT 06877
Charge No: 16A-2025-00552

EEOC Representative and email:    DARLAN BASTIDAS
SUPERVISORY INVESTIGATOR
DARLAN.BASTIDAS@EEOC.GOV

---

### NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

The EEOC has granted your request for a Notice of Right to Sue, and more than 180 days have passed since the filing of this charge.

The EEOC is terminating its processing of this charge. The EEOC is closing your case. Therefore, your lawsuit under the ADEA must be filed in federal or state court WITHIN 90 DAYS of your receipt of the EEOC's official notice of dismissal. Otherwise, your right to sue based on the above-numbered charge will be lost.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice that the EEOC has dismissed your charge and has issued you notice of your right to sue the respondent(s) on this charge. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of EEOC's official notice of dismissal.** You should keep a record of the date you received the EEOC's official notice of dismissal. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission,

Digitally Signed By:Arlean Nieto
02/02/2026
Arlean Nieto
Acting District Director

# EXHIBIT E



# CUTTING 'OLD HEADS' AT IBM

As it scrambled to compete in the internet world, the once-dominant tech company cut tens of thousands of U.S. workers, hitting its most senior employees hardest and flouting rules against age bias.

by Peter Gosselin and Ariana Tobin

March 22, 2018

March 22, 2018

*This story was co-published with Mother Jones.*

**FOR NEARLY A HALF CENTURY,** IBM came as close as any company to bearing the torch for the American Dream.

As the world's dominant technology firm, payrolls at International Business Machines Corp. swelled to nearly a quarter-million U.S. white-collar workers in the 1980s. Its profits helped underwrite a broad agenda of racial equality, equal pay for women and an unbeatable offer of great wages and something close to lifetime employment, all in return for unswerving loyalty.

But when high tech suddenly started shifting and companies went global, IBM faced the changing landscape with a distinction most of its fiercest competitors didn't have: a large number of experienced and aging U.S. employees.

The company reacted with a strategy that, in the words of one confidential planning document, would "correct seniority mix." It slashed IBM's U.S. workforce by as much as three-quarters from its 1980s peak, replacing a substantial share with younger, less-experienced and lower-paid workers and sending many positions overseas. ProPublica estimates that in the past five years alone, IBM has eliminated more than 20,000 American employees ages 40 and over, about 60 percent of its estimated total U.S. job cuts during those years.

**HOW THE CROWD LED US TO INVESTIGATE IBM**

Our project started with a digital community of ex-employees. Read more about how we got this story.

**EMAIL UPDATES**

Sign up to get ProPublica's major investigations delivered to your inbox.

Subscribe

This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

**DO YOU HAVE INFORMATION ABOUT AGE DISCRIMINATION AT IBM?**
Let us know.

In making these cuts, IBM has flouted or outflanked U.S. laws and regulations intended to protect later-career workers from age discrimination, according to a ProPublica review of internal company documents, legal filings and public records, as well as information provided via interviews and questionnaires filled out by more than 1,000 former IBM employees.

Among ProPublica's findings, IBM:

- Denied older workers information the law says they need in order to decide whether they've been victims of age bias, and required them to sign away the right to go to court or join with others to seek redress.

- Targeted people for layoffs and firings with techniques that tilted against older workers, even when the company rated them high performers. In some instances, the money saved from the departures went toward hiring young replacements.

- Converted job cuts into retirements and took steps to boost resignations and firings. The moves reduced the number of employees counted as layoffs, where high numbers can trigger public disclosure requirements.

- Encouraged employees targeted for layoff to apply for other IBM positions, while quietly advising managers not to hire them and requiring many of the workers to train their replacements.

- Told some older employees being laid off that their skills were out of date, but then brought them back as contract workers, often for the same work at lower pay and fewer benefits.

IBM declined requests for the numbers or age breakdown of its job cuts. ProPublica provided the company with a 10-page summary of its findings and the evidence on which they were based. IBM spokesman Edward Barbini said that to respond the company needed to see copies of all documents cited in the story, a request ProPublica could not fulfill without breaking faith with its sources. Instead, ProPublica provided IBM with detailed descriptions of the paperwork. Barbini declined to address the documents or answer specific questions about the firm's policies and practices, and instead issued the following statement:

"We are proud of our company and our employees' ability to reinvent themselves era after era, while always complying with the law. Our ability to do this is why we are the only tech company that has not only survived but thrived for more than 100 years."

With nearly 400,000 people worldwide, and tens of thousands still in the U.S., IBM remains a corporate giant. How it handles the shift from its veteran baby-boom workforce to younger generations will likely influence what other employers do. And the way it treats its experienced workers will eventually affect younger IBM employees as they too age.

Fifty years ago, Congress made it illegal with the Age Discrimination in Employment Act, or ADEA, to treat older workers differently than younger ones with only a few exceptions, such as jobs that require special physical qualifications. And for years, judges and policymakers treated the law as essentially on a par with prohibitions against discrimination on the basis of race, gender, sexual orientation and other categories.

In recent decades, however, the courts have responded to corporate pleas for greater leeway to meet global competition and satisfy investor demands for

rising profits by expanding the exceptions and shrinking the protections against age bias.

"Age discrimination is an open secret like sexual harassment was until recently," said Victoria Lipnic, the acting chair of the Equal Employment Opportunity Commission, or EEOC, the independent federal agency that administers the nation's workplace anti-discrimination laws.

"Everybody knows it's happening, but often these cases are difficult to prove" because courts have weakened the law, Lipnic said. "The fact remains it's an unfair and illegal way to treat people that can be economically devastating."

Many companies have sought to take advantage of the court rulings. But the story of IBM's downsizing provides an unusually detailed portrait of how a major American corporation systematically identified employees to coax or force out of work in their 40s, 50s and 60s, a time when many are still productive and need a paycheck, but face huge hurdles finding anything like comparable jobs.

The dislocation caused by IBM's cuts has been especially great because until recently the company encouraged its employees to think of themselves as "IBMers" and many operated under the assumption that they had career-long employment.

When the ax suddenly fell, IBM provided almost no information about why an employee was cut or who else was departing, leaving people to piece together what had happened through websites, listservs and Facebook groups such as "Watching IBM" or "Geographically Undesirable IBM Marketers," as well as informal support groups.

Marjorie Madfis, at the time 57, was a New York-based digital marketing strategist and 17-year IBM employee when she and six other members of her nine-person team — all women in their 40s and 50s — were laid off in July 2013. The two who remained were younger men.

Since her specialty was one that IBM had said it was expanding, she asked for a written explanation of why she was let go. The company declined to provide it.



*Marjorie Madfis was among seven women in their 40s and 50s laid off from their IBM marketing team in White Plains, New York, in 2013. The two members who remained were younger men. "The only explanation is our age," says Madfis. (Demetrius Freeman for ProPublica)*

"They got rid of a group of highly skilled, highly effective, highly respected women, including me, for a reason nobody knows," Madfis said in an interview. "The only explanation is our age."

Brian Paulson, also 57, a senior manager with 18 years at IBM, had been on the road for more than a year overseeing hundreds of workers across two continents as well as hitting his sales targets for new services, when he got a phone call in October 2015 telling him he was out. He said the caller, an executive who was not among his immediate managers, cited "performance" as the reason, but refused to explain what specific aspects of his work might have fallen short.

It took Paulson two years to land another job, even though he was equipped with an advanced degree, continuously employed at high-level technical jobs for more than three decades and ready to move anywhere from his Fairview, Texas, home.

"It's tough when you've worked your whole life," he said. "The company doesn't tell you anything. And once you get to a certain age, you don't hear a word from the places you apply."

Paul Henry, a 61-year-old IBM sales and technical specialist who loved being on the road, had just returned to his Columbus home from a business trip in August 2016 when he learned he'd been let go. When he asked why, he said an executive told him to "keep your mouth shut and go quietly."

Henry was jobless more than a year, ran through much of his savings to cover the mortgage and health insurance and applied for more than 150 jobs before he found a temporary slot.

"If you're over 55, forget about preparing for retirement," he said in an interview. "You have to prepare for losing your job and burning through every cent you've saved just to get to retirement."

IBM's latest actions aren't anything like what most ex-employees with whom ProPublica talked expected from their years of service, or what today's young workers think awaits them — or are prepared to deal with — later in their careers.

"In a fast-moving economy, employers are always going to be tempted to replace older workers with younger ones, more expensive workers with cheaper ones, those who've performed steadily with ones who seem to be up on the latest thing," said Joseph Seiner, an employment law professor at the University of South Carolina and former appellate attorney for the EEOC.

"But it's not good for society," he added. "We have rules to try to maintain some fairness in our lives, our age-discrimination laws among them. You can't just disregard them."



## 'Old Heads' Needn't Apply

**FOR MUCH OF ITS HISTORY,** IBM viewed its fate and that of its predominantly U.S. workforce as inseparable. By the late 1960s, the company's grip on the mainframe computer business had grown so great the Justice Department sued it for monopolizing the industry, a case that dragged on for years before being dropped as "without merit." Such dominance convinced executives they could deliver extraordinary workplace stability in return for loyal service.

"When recessions occur or there is a major product shift, some companies handle the resulting workforce imbalances by letting people go," explained an employee handbook of the 1980s. By contrast, IBM "retrains, reassigns and even relocates employees."

For their part, continued the handbook, employees must be "flexible, willing to change, work overtime, and adapt to new situations quickly." The logic behind the bargain was that "people are a treasured resource." At IBM, "they are treated like one."

But within a decade, IBM had stumbled not once but three times, in ways that would come to cost both the company and its workers. First, it failed to appreciate the "major product shift" behind a new chip technology that first entered people's lives as the guts of pocket calculators and cheap digital watches and was making possible increasingly powerful and networked personal computers that undercut the company's mainframe business. Second, it misjudged its employees' reaction to switching to a kind of pension that no longer rewarded older, long-service workers. IBM workers responded with a lawsuit that forced the company to settle by paying more than $300 million and reinstating expensive traditional pensions for more than 100,000 of them.

And by the early years of the new century, IBM was falling behind again by failing to quickly devise innovative uses for the internet like its new rivals, Google, Facebook and Amazon. As it slipped, the company began having second thoughts about the price of unbending loyalty to its long-serving workforce.

In a little-

> Just as importantly, business needs the gray hairs just as much as the old heads need and want the work. What businesses can't afford to do is simply rehire their experienced workers and put them back into their old jobs. Businesses have to think smarter than that. They must learn to leverage the experience and practical intelligence of mature people, and get them to work with younger colleagues and reinvest their experience back into the business.

*This excerpt from a 2006 IBM Business Consulting Services paper titled "The Maturing Workforce" refers to baby-boomer employees as "gray hairs" and "old heads."* Read the full report.

noticed paper issued in 2006 by the London office of one of the company's consulting arms, executives praised boomers' experience, but described them as "gray hairs" and "old heads." While recognizing that older workers were important to high-tech employers such as IBM, it concluded that "successor generations ... are generally much more innovative and receptive to technology than baby boomers."

The paper was subsequently cited in an age discrimination lawsuit in U.S. District Court in Pennsylvania. Before the complaint was settled last year, the plaintiffs alleged in a filing: "IBM's Boomer employees — being labeled by IBM's own research as uncollaborative, skeptical of leadership, technologically unsophisticated, less innovative and generally out of touch with IBM's brand, customers and objectives — were shown the door in droves."

By the time IBM's current CEO, Virginia "Ginni" Rometty, took over in 2012, the company had shifted its personnel focus to millennials.

Rometty launched a major overhaul that aimed to make IBM a major player in the emerging technologies of cloud services, big data analytics, mobile, security and social media, or what came to be known inside as CAMS.

At the same time, she sought to sharply increase hiring of people born after 1980.

"CAMS are driven by Millennial Traits," declared a slide presentation for an invitation-only IBM event in New York in December 2014. Not only were millennials in sync with the new technologies, but they were also attuned to the collaborative, consensus-driven modes of work these technologies demanded, company researchers said they'd discovered. Millennials "are not likely to make decisions in isolation," the presentation said, but instead "depend on analytic technologies to help them."

By contrast, people 50 or over are "more dubious" of analytics, "place less stock in the advantages data offers," and are less "motivated to consult their colleagues or get their buy in ... It's Baby Boomers who are the outliers."

The message was clear. To succeed at the new technologies, the company must, in the words of the presentation, "become one with the Millennial mindset." Similar language found its way into a variety of IBM presentations in subsequent years.

Even before the New York conference, IBM had begun a major effort to recruit millennial employees. It launched a blog, "The Millennial Experience," and a hashtag on Twitter, #IBMMillennial." It began an online and print advertising campaign primarily featuring young people. It established a "Millennial Corps," a network of more than 5,000 young IBMers whom Rometty and other top executives said they'd regularly consult before making business decisions. And it sharply improved benefits, like parental leave, especially important to younger employees.

Its initiatives won IBM plaudits from women's groups; lesbian, gay, bisexual and transgender organizations; human rights and disability associations; indeed advocates for just about every class of people protected under U.S. equal employment opportunity laws.

And the entire effort was guided by something that then-IBM brand strategist Bill Grady told the 2014 conference: "What's good for Millennials is good for everyone."

# Exit Strategy

**AS IBM TRAINED ITS SIGHTS** on younger workers, it also took steps to change the way it dealt with those who'd spent many years on the job. It embraced a legal strategy that made it much easier for the company to dismiss older workers, and to do so in ways that minimized legal consequences and largely avoided public attention.

Until 2014, IBM had provided two lists to workers getting laid off. One showed the positions and ages, but not the names, of all the people laid off from their business units at the same time. The other showed the positions and ages of all those staying on. For example, Madfis, the digital marketing strategist, got a list when she was let go in July 2013.

Such lists are common in corporate layoffs, thanks to a disclosure requirement added to the ADEA in 1990. The reason for the new rule was that virtually all employers had begun making severance pay and other parting benefits contingent on a laid-off worker signing away the right to sue the company. Congress wanted to make sure that before employees signed such waivers they understood enough to make "knowing and voluntary" decisions about whether they might have been targeted because of their age.

IBM complied with the disclosure requirement for more than two decades. As a result, even when the company stopped disclosing its U.S. employment totals — and thus its job cuts — the numbers still became known as employees collected and tallied the number of layoffs from lists provided to workers by various company units.

**ONE DEPARTURE, TWO LETTERS**

Just a few months after receiving a layoff notice, the same employee received a congratulatory letter about retiring.



I am writing to provide you with important information. As we recently discussed, IBM is conducting a resource action impacting your organization. The resource action is being implemented in an effort to streamline operations and increase business productivity.

==You have been identified for permanent layoff and your IBM employment will end on May 31,== 2016, unless you are offered and accept a new position within IBM before that date.* Although departure dates may change based on business needs, the earliest departure date for any employee as a result of this resource action is May 31, 2016. I appreciate your cooperation and professionalism in the weeks ahead as we work through this timeframe.

IBM recognizes that this can be a difficult time for you and your family. Therefore, you are eligible for services and assistance designed to support you through this transition. Support services include both a transition payment and continuing benefits, as well as access to outplacement services, retraining assistance and career counseling. IBM recently enhanced the Career Transition Services provided through Right Management and employees are encouraged to begin using these services immediately. Information about the services is available in the Resource Action Information Package and at this link www.right.com/getstarted. In addition, you and your family are eligible to receive short-term counseling through the IBM Employee Assistance Program (EAP), administered by Optum. Details on the EAP support services can be found in the attached Information Package and through this website: http://w3-01.ibm.com/hr/web/us/benefits/medical/mhcp/eap.html.

Please review the Information Package thoroughly, note any deadlines and retain it for future use. If you have questions regarding the enclosed material, please contact the IBM Employee Services Center at 800-796-9876 as indicated in your package. For other questions contact the Project Office at GTS TM Project Office/Raleigh/IBM.

Attachment
*Please note:  IBM does not practice "bumping rights." This means that regardless of your level of service, you do not have the option of assuming another position if it would, in turn, displace or "bump" another regular IBM employee.



International Business Machines Corporation

One New Orchard Road, Armonk, New York 10504-1783



*Virginia M. Rometty, Chairman, President and Chief Executive Officer*

May 31, 2016

Dear ███████

I wanted to take this opportunity to <mark>wish you well on your retirement from IBM.</mark> Your dedication and contributions over the years helped establish IBM as one of the most successful and respected companies in the world.

You have been a part of shaping our history as a leader. While you may be retiring to embark on the next phase of your personal journey, you will always remain a valued and appreciated member of the IBM family.

My very best wishes for good health, happiness, and success.

Sincerely,

*Ginni Rometty*



Case 3:26-cv-00402-MPS    Document 1    Filed 03/18/26    Page 50 of 103

So after it ran into political flak for its workforce reductions, IBM decided to stop giving out the lists. When Diane Moos, 62, of Long Beach, California, lost her job as a systems security specialist in May 2016, she had no way of knowing how many people had been laid off with her, or their ages.

IBM spokesman Doug Shelton said at the time the company was acting out of concern for its workers who had complained the disclosures "infringed on employee privacy" — even though the lists contained no names.

How did IBM get around the legal requirement for the disclosures? With a move that even critics acknowledge is ingenious.

The company's pre-2014 layoff documents required employees receiving severance to waive all bias claims based on "race, national origin, ancestry, color, creed, religion, sex, sexual orientation, pregnancy, marital status, age … disability, medical condition, or veteran status." The new documents deleted "age" from the waiver list. In fact, they specifically said employees were *not* waiving their right when it came to age and *could* pursue age discrimination cases against the company.

But, the new documents added, employees had to waive the right to take their age cases to court. Instead, they had to pursue them through private arbitration. What's more, they had to keep them confidential and pursue them alone. They couldn't join with other workers to make a case.

With the new documents in place, IBM was no longer asking laid-off workers to sign away their right to complain about age bias so, the company's lawyers told the EEOC, the disclosure requirement in the 1990 amendments to the age act no longer applied.

Critics say the company's argument is hard to square with the statute's clear requirements.

"You have a law that says older workers being laid off need this information and employers are obligated to provide it. You have a company that's not providing it," said David Lopez, the former general counsel for the EEOC. "How can this not be undercutting the intent of the law?"

In their relationships with both workers and customers, American corporations are making increasingly heavy use of arbitration, contending the process is fair and saves all parties time and legal costs. The Supreme Court has repeatedly expanded the right of companies to require that disputes be settled by arbitrators rather than judges.

When it comes to employment claims, studies have found that arbitrators overwhelmingly favor employers. Research by Cornell University law and labor relations specialist Alexander Colvin found that workers win only 19 percent of the time when their cases are arbitrated. By contrast, they win 36 percent of the time when they go to federal court, and 57 percent in state courts. Average payouts when an employee wins follow a similar pattern.

Given those odds, and having signed away their rights to go to court, some laid-off IBM workers have chosen the one independent forum companies can't deny them: the U.S. Equal Employment Opportunity Commission. That's where Moos, the Long Beach systems security specialist, and several of her colleagues, turned for help when they were laid off. In their complaints to the agency, they said they'd suffered age discrimination because of the company's effort to "drastically change the IBM employee age mix … to be seen as a startup."

In its formal reply to the EEOC, IBM said that age couldn't have been a factor in their dismissals. Among the reasons it cited: The managers who decided on the layoffs were in their 40s and therefore older too.



## Tilting the Table

**WHETHER IBM IS STAYING WITHIN** U.S. age laws as it cuts from and adds to its workforce turns largely on how and why the company chooses individuals to be eliminated. While executives say they never target older workers, internal company documents and interviews suggest otherwise.

Consider, for example, a planning presentation that former IBM executives said was drafted by heads of a business unit carved out of IBM's once-giant software group and charged with pursuing the "C," or cloud, portion of the company's CAMS strategy.

The presentation laid out plans for substantially altering the unit's workforce. It was shown to company leaders including Diane Gherson, the senior vice president for human resources, and James Kavanaugh, recently elevated to chief financial officer. Its language was couched in the argot of "resources," IBM's term for employees, and "EP's," its shorthand for early professionals or recent college graduates.

Among the goals: "Shift headcount mix towards greater % of Early Professional hires."

Among the means: "[D]rive a more aggressive performance management approach to enable us to hire and replace where needed, and fund an influx of EPs to correct seniority mix."

Among the expected results: "[A] significant reduction in our workforce of 2,500 resources."

A slide from a similar presentation prepared last spring for the same leaders called for "re-profiling current talent" to "create room for new talent." Presentations for 2015 and 2016 for the 50,000-employee software group also included plans for "aggressive performance management" and emphasized the need to "maintain steady attrition to offset hiring."

IBM declined to answer questions about whether either presentation was turned into company policy. The description of the planned moves matches what hundreds of older ex-employees told ProPublica they believe happened to them: They were ousted because of their age. The company used their exits to hire replacements, many of them young; to ship their work overseas; or to cut its overall headcount.

Ed Alpern, now 65, of Austin, started his 39-year run with IBM as a Selectric typewriter repairman. He ended as a project manager in October of 2016 when, he said, his manager told him he could either leave with severance and other parting benefits or be given a bad job review — something he said he'd never previously received — and risk being fired without them.

Albert Poggi, now 70, was a three-decade IBM veteran and ran the company's Palisades, New York, technical center where clients can test new products. When notified in November of 2016 he was losing his job to layoff, he asked his bosses why, given what he said was a history of high job ratings. "They told me," he said, "they needed to fill it with someone newer."

The presentations from the software group, as well as the stories of ex-employees like Alpern and Poggi, square with internal documents from two other major IBM business units. The documents for all three cover some or all of the years from 2013 through the beginning of 2018 and deal with job assessments, hiring, firing and layoffs.

The documents detail practices that appear at odds with how IBM says it treats its employees. In many instances, the practices in effect, if not intent, tilt against the company's older U.S. workers.

For example, IBM spokespeople and lawyers have said the company never considers a worker's age in making decisions about layoffs or firings.

But one 2014 document reviewed by ProPublica includes dates of birth. An ex-IBM employee familiar with the process said executives from one business unit used it to decide about layoffs or other job changes for nearly a thousand workers, almost two-thirds of them over 50.

Documents from subsequent years show that young workers are protected from cuts for at least a limited period of time. A 2016 slide presentation prepared by the company's global technology services unit, titled "U.S. Resource Action Process" and used to guide managers in layoff procedures, includes bullets for categories considered "ineligible" for layoff. Among them: "early professional hires," meaning recent college graduates.



*This slide, from an invitation-only IBM conference in New York in December 2014, suggests that the company's future success in marketing emerging technologies depended on how well it understood and embraced the generation born after 1980.*

**Donate**

In responding to age-discrimination complaints that ex-employees file with the EEOC, lawyers for IBM say that front-line managers make all decisions about who gets laid off, and that their decisions are based strictly on skills and job performance, not age.

But ProPublica reviewed spreadsheets that indicate front-line managers hardly acted alone in making layoff calls. Former IBM managers said the spreadsheets were prepared for upper-level executives and kept continuously updated. They list hundreds of employees together with codes like "lift and shift," indicating that their jobs were to be lifted from them and shifted overseas, and details such as whether IBM's clients had approved the change.

An examination of several of the spreadsheets suggests that, whatever the criteria for assembling them, the resulting list of those marked for layoff was skewed toward older workers. A 2016 spreadsheet listed more than 400 full-time U.S. employees under the heading "REBAL," which refers to "rebalancing," the process that can lead to laying off workers and either replacing them or shifting the jobs overseas. Using the job search site LinkedIn, ProPublica was able to locate about 100 of these employees and then obtain their ages through public records. Ninety percent of those found were 40 or older. Seventy percent were over 50.

IBM frequently cites its history of encouraging diversity in its responses to EEOC complaints about age discrimination. "IBM has been a leader in taking positive actions to ensure its business opportunities are made available to individuals without regard to age, race, color, gender, sexual orientation and other categories," a lawyer for the company wrote in a May 2017 letter. "This policy of non-discrimination is reflected in all IBM business activities."

But ProPublica found at least one company business unit using a point system that disadvantaged older workers. The system awarded points for attributes valued by the company. The more points a person garnered, according to the former employee, the more protected she or he was from layoff or other negative job change; the fewer points, the more vulnerable.

The arrangement appears on its face to favor younger newcomers over older veterans. Employees were awarded points for being relatively new at a job level or in a particular role. Those who worked for IBM for fewer years got more points than those who'd been there a long time.

The ex-employee familiar with the process said a 2014 spreadsheet from that business unit, labeled "IBM Confidential," was assembled to assess the job prospects of more than 600 high-level employees, two-thirds of them from the U.S. It included employees' years of service with IBM, which the former employee said was used internally as a proxy for age. Also listed was an assessment by their bosses of their career trajectories as measured by the highest job level they were likely to attain if they remained at the company, as well as their point scores.

The tilt against older workers is evident when employees' years of service are compared with their point scores. Those with no points and therefore most vulnerable to layoff had worked at IBM an average of more than 30 years; those with a high number of points averaged half that.

Perhaps even more striking is the comparison between employees' service years and point scores on the one hand and their superiors' assessments of their career trajectories on the other.

Along with many American employers, IBM has argued it needs to shed older workers because they're no longer at the top of their games or lack "contemporary" skills.

But among those sized up in the confidential spreadsheet, fully 80 percent of older employees — those with the most years of service but no points and therefore most vulnerable to layoff — were rated by superiors as good enough to stay at their current job levels or be promoted. By contrast, only a small percentage of younger employees with a high number of points were similarly rated.

"No major company would use tools to conduct a layoff where a disproportionate share of those let go were African Americans or women," said Cathy Ventrell-Monsees, senior attorney adviser with the EEOC and former director of age litigation for the senior lobbying giant AARP. "There's no difference if the tools result in a disproportionate share being older workers."

In addition to the point system that disadvantaged older workers in layoffs, other documents suggest that IBM has made increasingly aggressive use of its job-rating machinery to pave the way for straight-out firings, or what the company calls "management-initiated separations." Internal documents suggest that older workers were especially targets.

Like in many companies, IBM employees sit down with their managers at the start of each year and set goals for themselves. IBM graded on a scale of 1 to 4, with 1 being top-ranked.

Those rated as 3 or 4 were given formal short-term goals known as personal improvement plans, or PIPs. Historically many managers were lenient, especially toward those with 3s whose ratings had dropped because of forces beyond their control, such as a weakness in the overall economy, ex-employees said.

**ERODING PROTECTION UNDER THE LAW**

Older Americans who face discrimination on the job can't rely on the courts as much as earlier generations did. Read more.

But within the past couple of years, IBM appears to have decided the time for leniency was over. For example, a software group planning document for 2015 said that, over and above layoffs, the unit should seek to fire about 3,000 of the unit's 50,000-plus workers.

To make such deep cuts, the document said, executives should strike an "aggressive performance management posture." They needed to double the share of employees given low 3 and 4 ratings to at least 6.6 percent of the division's workforce. And because layoffs cost the company more than outright dismissals or resignations, the document said, executives should make sure that more than 80 percent of those with low ratings get fired or forced to quit.

Finally, the 2015 document said the division should work "to attract the best and brightest early professionals" to replace up to two-thirds of those sent packing. A more recent planning document — the presentation to top executives Gherson and Kavanaugh for a business unit carved out of the software group — recommended using similar techniques to free up money by cutting current employees to fund an "influx" of young workers.

In a recent interview, Poggi said he was resigned to being laid off. "Everybody at IBM has a bullet with their name on it," he said. Alpern wasn't nearly as accepting of being threatened with a poor job rating and then fired.

Alpern had a particular reason for wanting to stay on at IBM, at least until the end of last year. His younger son, Justin, then a high school senior, had been named a National Merit semifinalist. Alpern wanted him to be able to apply for one of the company's Watson scholarships. But IBM had recently narrowed eligibility so only the children of current employees could apply, not also retirees as it was until 2014.

Alpern had to make it through December for his son to be eligible.

But in August, he said, his manager ordered him to retire. He sought to buy time by appealing to superiors. But he said the manager's response was to threaten him with a bad job review that, he was told, would land him on a PIP, where his work would be scrutinized weekly. If he failed to hit his targets — and his managers would be the judges of that — he'd be fired and lose his benefits.

Alpern couldn't risk it; he retired on Oct. 31. His son, now a freshman on the dean's list at Texas A&M University, didn't get to apply.

"I can think of only a couple regrets or disappointments over my 39 years at IBM,"" he said, "and that's one of them."



## 'Congratulations on Your Retirement!'

**LIKE ANY COMPANY IN THE U.S.,** IBM faces few legal constraints to reducing the size of its workforce. And with its no-disclosure strategy, it eliminated one of the last regular sources of information about its employment practices and the changing size of its American workforce.

But there remained the question of whether recent cutbacks were big enough to trigger state and federal requirements for disclosure of layoffs. And internal documents, such as a slide in a 2016 presentation titled "Transforming to Next Generation Digital Talent," suggest executives worried that "winning the talent war" for new young workers required IBM to improve the "attractiveness of (its) culture and work environment," a tall order in the face of layoffs and firings.

So the company apparently has sought to put a softer face on its cutbacks by recasting many as voluntary rather than the result of decisions by the firm. One way it has done this is by converting many layoffs to retirements.

Some ex-employees told ProPublica that, faced with a layoff notice, they were just as happy to retire. Others said they felt forced to accept a retirement package and leave. Several actively objected to the company treating their ouster as a retirement. The company nevertheless processed their exits as such.

Project manager Ed Alpern's departure was treated in company paperwork as a voluntary retirement. He didn't see it that way, because the alternative he said he was offered was being fired outright.

Lorilynn King, a 55-year-old IT specialist who worked from her home in Loveland, Colorado, had been with IBM almost as long as Alpern by May 2016 when her manager called to tell her the company was conducting a layoff and her name was on the list.

King said the manager told her to report to a meeting in Building 1 on IBM's Boulder campus the following day. There, she said, she found herself in a group of other older employees being told by an IBM human resources representative that they'd all be retiring. "I have NO intention of retiring," she remembers responding. "I'm being laid off."

ProPublica has collected documents from 15 ex-IBM employees who got layoff notices followed by a retirement package and has talked with many others who said they received similar paperwork. Critics say the sequence doesn't square well with the law.

"This country has banned mandatory retirement," said Seiner, the University of South Carolina law professor and former EEOC appellate lawyer. "The law says taking a retirement package has to be voluntary. If you tell somebody 'Retire or we'll lay you off or fire you,' that's not voluntary."

Until recently, the company's retirement paperwork included a letter from Rometty, the CEO, that read, in part, "I wanted to take this opportunity to wish you well on your retirement … While you may be retiring to embark on the next phase of your personal journey, you will always remain a valued and appreciated member of the IBM family." Ex-employees said IBM stopped sending the letter last year.

IBM has also embraced another practice that leads workers, especially older ones, to quit on what appears to be a voluntary basis. It substantially reversed its pioneering support for telecommuting, telling people who've been working from home for years to begin reporting to certain, often distant, offices. Their other choice: Resign.

David Harlan had worked as an IBM marketing strategist from his home in Moscow, Idaho, for 15 years when a manager told him last year of orders to reduce the performance ratings of everybody at his pay grade. Then in February last year, when he was 50, came an internal video from IBM's new senior vice president, Michelle Peluso, which announced plans to improve the work of marketing employees by ordering them to work "shoulder to shoulder." Those who wanted to stay on would need to "co-locate" to offices in one of six cities.

Early last year, Harlan received an email congratulating him on "the opportunity to join your team in Raleigh, North Carolina." He had 30 days to decide on the 2,600-mile move. He resigned in June.





*David Harlan worked for IBM for 15 years from his home in Moscow, Idaho, where he also runs a drama company. Early last year, IBM offered him a choice: Move 2,600 miles to Raleigh-Durham to begin working at an office, or resign. He left in June. (Rajah Bose for ProPublica)*

After the Peluso video was leaked to the press, an IBM spokeswoman told the Wall Street Journal that the "vast majority" of people ordered to change locations and begin reporting to offices did so. IBM Vice President Ed Barbini said in an initial email exchange with ProPublica in July that the new policy affected only about 2,000 U.S. employees and that "most" of those had agreed to move.

But employees across a wide range of company operations, from the systems and technology group to analytics, told ProPublica they've also been ordered to co-locate in recent years. Many IBMers with long service said that they quit rather than sell their homes, pull children from school and desert aging parents. IBM declined to say how many older employees were swept up in the co-location initiative.

"They basically knew older employees weren't going to do it," said Eileen Maroney, a 63-year-old IBM product manager from Aiken, South Carolina, who, like Harlan, was ordered to move to Raleigh or resign. "Older people aren't going to move. It just doesn't make any sense." Like Harlan, Maroney left IBM last June.

Having people quit rather than being laid off may help IBM avoid disclosing how much it is shrinking its U.S. workforce and where the reductions are occurring.

Under the federal WARN Act, adopted in the wake of huge job cuts and factory shutdowns during the 1980s, companies laying off 50 or more employees who constitute at least one-third of an employer's workforce at a site have to give advance notice of layoffs to the workers, public agencies and local elected officials.

Similar laws in some states where IBM has a substantial presence are even stricter. California, for example, requires advanced notice for layoffs of 50 or more employees, no matter what the share of the workforce. New York requires notice for 25 employees who make up a third.

Because the laws were drafted to deal with abrupt job cuts at individual plants, they can miss reductions that occur over long periods among a workforce like IBM's that was, at least until recently, widely dispersed because of the company's work-from-home policy.

IBM's training sessions to prepare managers for layoffs suggest the company was aware of WARN thresholds, especially in states with strict notification laws such as California. A 2016 document entitled "Employee Separation Processing" and labeled "IBM Confidential" cautions managers about the "unique steps that must be taken when processing separations for California employees."

A ProPublica review of five years of WARN disclosures for a dozen states where the company had large facilities that shed workers found no disclosures in nine. In the other three, the company alerted authorities of just under 1,000 job cuts — 380 in California, 369 in New York and 200 in Minnesota. IBM's reported figures are well below the actual number of jobs the company eliminated in these states, where in recent years it has shuttered, sold off or leveled plants that once employed vast numbers.

By contrast, other employers in the same 12 states reported layoffs last year alone totaling 215,000 people. They ranged from giant Walmart to Ostrom's Mushroom Farms in Washington state.

Whether IBM operated within the rules of the WARN act, which are notoriously fungible, could not be determined because the company declined to

provide ProPublica with details on its layoffs.

# A Second Act, But Poorer

**WITH 35 YEARS AT IBM** under his belt, Ed Miyoshi had plenty of experience being pushed to take buyouts, or early retirement packages, and refusing them. But he hadn't expected to be pushed last fall.

Miyoshi, of Hopewell Junction, New York, had some years earlier launched a pilot program to improve IBM's technical troubleshooting. With the blessing of an IBM vice president, he was busily interviewing applicants in India and Brazil to staff teams to roll the program out to clients worldwide.

The interviews may have been why IBM mistakenly assumed Miyoshi was a manager, and so emailed him to eliminate the one U.S.-based employee still left in his group.

"That was me," Miyoshi realized.

In his sign-off email to colleagues shortly before Christmas 2016, Miyoshi, then 57, wrote: "I am too young and too poor to stop working yet, so while this is good-bye to my IBM career, I fully expect to cross paths with some of you very near in the future."

He did, and perhaps sooner than his colleagues had expected; he started as a subcontractor to IBM about two weeks later, on Jan. 3.

Miyoshi is an example of older workers who've lost their regular IBM jobs and been brought back as contractors. Some of them — not Miyoshi — became contract workers after IBM told them their skills were out of date and no longer needed.

Employment law experts said that hiring ex-employees as contractors can be legally dicey. It raises the possibility that the layoff of the employee was not for the stated reason but perhaps because they were targeted for their age, race or gender.

IBM appears to recognize the problem. Ex-employees say the company has repeatedly told managers — most recently earlier this year — not to contract with former employees or sign on with third-party contracting firms staffed by ex-IBMers. But ProPublica turned up dozens of instances where the company did just that.



*off in December 2016, Ed Miyoshi of Hopewell Junction, New York, started work as a subcontractor to the company. But he took a $20,000-a-year pay cut. "I'm not a millionaire, so that's a lot of m*

Responding to a question in a confidential questionnaire from ProPublica, one 35-year company veteran from New York said he knew exactly what happened to the job he left behind when he was laid off. "I'M STILL DOING IT. I got a new gig eight days after departure, working for a third-party company under contract to IBM doing the exact same thing."

In many cases, of course, ex-employees are happy to have another job, even if it is connected with the company that laid them off.

Henry, the Columbus-based sales and technical specialist who'd been with IBM's "resiliency services" unit, discovered that he'd lost his regular IBM job because the company had purchased an Indian firm that provided the same services. But after a year out of work, he wasn't going to turn down the offer of

a temporary position as a subcontractor for IBM, relocating data centers. It got money flowing back into his household and got him back where he liked to be, on the road traveling for business.

The compensation most ex-IBM employees make as contractors isn't comparable. While Henry said he collected the same dollar amount, it didn't include health insurance, which cost him $1,325 a month. Miyoshi said his paycheck is 20 percent less than what he made as an IBM regular.

"I took an over $20,000 hit by becoming a contractor. I'm not a millionaire, so that's a lot of money to me," Miyoshi said.

And lower pay isn't the only problem ex-IBM employees-now-subcontractors face. This year, Miyoshi's payable hours have been cut by an extra 10 "furlough days." Internal documents show that IBM repeatedly furloughs subcontractors without pay, often for two, three or more weeks a quarter. In some instances, the furloughs occur with little advance notice and at financially difficult moments. In one document, for example, it appears IBM managers, trying to cope with a cost overrun spotted in mid-November, planned to dump dozens of subcontractors through the end of the year, the middle of the holiday season.

Former IBM employees now on contract said the company controls costs by notifying contractors in the midst of projects they have to take pay cuts or lose the work. Miyoshi said that he originally started working for his third-party contracting firm for 10 percent less than at IBM, but ended up with an additional 10 percent cut in the middle of 2017, when IBM notified the contractor it was slashing what it would pay.

For many ex-employees, there are few ways out. Henry, for example, sought to improve his chances of landing a new full-time job by seeking assistance to finish a college degree through a federal program designed to retrain workers hurt by offshoring of jobs.

But when he contacted the Ohio state agency that administers the Trade Adjustment Assistance, or TAA, program, which provides assistance to workers who lose their jobs for trade-related reasons, he was told IBM hadn't submitted necessary paperwork. State officials said Henry could apply if he could find other IBM employees who were laid off with him, information that the company doesn't provide.

TAA is overseen by the Labor Department but is operated by states under individual agreements with Washington, so the rules can vary from state to state. But generally employers, unions, state agencies and groups of employers can petition for training help and cash assistance. Labor Department data compiled by the advocacy group Global Trade Watch shows that employers apply in about 40 percent of cases. Some groups of IBM workers have obtained retraining funds when they or their state have applied, but records dating back to the early 1990s show IBM itself has applied for and won taxpayer assistance only once, in 2008, for three Chicago-area workers whose jobs were being moved to India.



## Teasing New Jobs

**AS IBM ELIMINATED THOUSANDS** of jobs in 2016, David Carroll, a 52-year-old Austin software engineer, thought he was safe.

His job was in mobile development, the "M" in the company's CAMS strategy. And if that didn't protect him, he figured he was only four months shy of qualifying for a program that gives employees who leave within a year of their three-decade mark access to retiree medical coverage and other benefits.

But the layoff notice Carroll received March 2 gave him three months — not four — to come up with another job. Having been a manager, he said he knew the gantlet he'd have to run to land a new position inside IBM.

Still, he went at it hard, applying for more than 50 IBM jobs, including one for a job he'd successfully done only a few years earlier. For his effort, he got one offer — the week after he'd been forced to depart. He got severance pay but lost access to what would have been more generous benefits.

Edward Kishkill, then 60, of Hillsdale, New Jersey, had made a similar calculation.

A senior systems engineer, Kishkill recognized the danger of layoffs, but assumed he was immune because he was working in systems security, the "S" in CAMS and another hot area at the company.

The precaution did him no more good than it had Carroll. Kishkill received a layoff notice the same day, along with 17 of the 22 people on his systems security team, including Diane Moos. The notice said that Kishkill could look for other jobs internally. But if he hadn't landed anything by the end of May, he was out.

With a daughter who was a senior in high school headed to Boston University, he scrambled to apply, but came up dry. His last day was May 31, 2016.

For many, the fruitless search for jobs within IBM is the last straw, a final break with the values the company still says it embraces. Combined with the company's increasingly frequent request that departing employees train their overseas replacements, it has left many people bitter. Scores of ex-employees interviewed by ProPublica said that managers with job openings told them they weren't allowed to hire from layoff lists without getting prior, high-level clearance, something that's almost never given.

ProPublica reviewed documents that show that a substantial share of recent IBM layoffs have involved what the company calls "lift and shift," lifting the work of specific U.S. employees and shifting it to specific workers in countries such as India and Brazil. For example, a document summarizing U.S. employment in part of the company's global technology services division for 2015 lists nearly a thousand people as layoff candidates, with the jobs of almost half coded for lift and shift.

Ex-employees interviewed by ProPublica said the lift-and-shift process required their extensive involvement. For example, shortly after being notified she'd be laid off, Kishkill's colleague, Moos, was told to help prepare a "knowledge transfer" document and begin a round of conference calls and email exchanges with two Indian IBM employees who'd be taking over her work. Moos said the interactions consumed much of her last three months at IBM.

# Next Chapters

**WHILE IBM HAS MANAGED** to keep the scale and nature of its recent U.S. employment cuts largely under the public's radar, the company drew some unwanted attention during the 2016 presidential campaign, when then-candidate Donald Trump lambasted it for eliminating 500 jobs in Minnesota, where the company has had a presence for a half century, and shifting the work abroad.

The company also has caught flak — in places like Buffalo, New York; Dubuque, Iowa; Columbia, Missouri, and Baton Rouge, Louisiana — for promising jobs in return for state and local incentives, then failing to deliver. In all, according to public officials in those and other places, IBM promised to bring on 3,400 workers in exchange for as much as $250 million in taxpayer financing but has hired only about half as many.

After Trump's victory, Rometty, in a move at least partly aimed at courting the president-elect, pledged to hire 25,000 new U.S. employees by 2020. Spokesmen said the hiring would increase IBM's U.S. employment total, although, given its continuing job cuts, the addition is unlikely to approach the promised hiring total.

When The New York Times ran a story last fall saying IBM now has more employees in India than the U.S., Barbini, the corporate spokesman, rushed to declare, "The U.S. has always been and remains IBM's center of gravity." But his stream of accompanying tweets and graphics focused as much on the company's record for racking up patents as hiring people.

IBM has long been aware of the damage its job cuts can do to people. In a series of internal training documents to prepare managers for layoffs in recent years, the company has included this warning: "Loss of a job ... often triggers a grief reaction similar to what occurs after a death."

Most, though not all, of the ex-IBM employees with whom ProPublica spoke have weathered the loss and re-invented themselves.

Marjorie Madfis, the digital marketing strategist, couldn't land another tech job after her 2013 layoff, so she headed in a different direction. She started a nonprofit called Yes She Can Inc. that provides job skills development for young autistic women, including her 21-year-old daughter.

After almost two years of looking and desperate for useful work, Brian Paulson, the widely traveled IBM senior manager, applied for and landed a position as a part-time rural letter carrier in Plano, Texas. He now works as a contract project manager for a Las Vegas gaming and lottery firm.

Ed Alpern, who started at IBM as a Selectric typewriter repairman, watched his son go on to become a National Merit Scholar at Texas A&M University, but not a Watson scholarship recipient.

Lori King, the IT specialist and 33-year IBM veteran who's now 56, got in a parting shot. She added an addendum to the retirement papers the firm gave her that read in part: "It was never my plan to retire earlier than at least age 60 and I am not committing to retire. I have been informed that I am impacted by a resource action effective on 2016-08-22, which is my last day at IBM, but I am NOT retiring."

King has aced more than a year of government-funded coding boot camps and university computer courses, but has yet to land a new job.

David Harlan still lives in Moscow, Idaho, after refusing IBM's "invitation" to move to North Carolina, and is artistic director of the Moscow Art Theatre (Too).

Ed Miyoshi is still a technical troubleshooter working as a subcontractor for IBM.

Ed Kishkill, the senior systems engineer, works part time at a local tech startup, but pays his bills as an associate at a suburban New Jersey Staples store.

Case 3:26-cv-00402-MPS    Document 1    Filed 03/18/26    Page 63 of 103    2/20/26, 11:30 AM

This year, Paul Henry was back on the road, working as an IBM subcontractor in Detroit, about 200 miles from where he lived in Columbus. On Jan. 8, he put in a 14-hour day and said he planned to call home before turning in. He died in his sleep.

**Correction, March 24, 2018:** *Eileen Maroney lives in Aiken, South Carolina. The name of her city was incorrect in the original version of this story.*

---

## DO YOU HAVE INFORMATION ABOUT AGE DISCRIMINATION AT IBM?

Let us know.

---




*Peter Gosselin*





# EXHIBIT F



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**New York District Office**

33 Whitehall Street, 5th Floor
New York, NY 10004-2112
Intake Information Group: (800) 669-4000
Intake Information Group TTY: (800) 669-6820
New York Direct Dial: (929) 506-5270
FAX (212) 336-3625
Website: www.eeoc.gov

## <u>DETERMINATION</u>

### <u>Respondent</u>
IBM Corporation
c/o Alison B. Marshall, Esq.
Partner
Jones Day
51 Louisiana Ave. NW
Washington, DC, 20001

### <u>Charging Parties' EEOC Charge Numbers (Amended)</u>

| | | | | |
|---|---|---|---|---|
| 430-2019-00626 | 520-2016-02973 | 520-2016-02994 | 520-2018-04720 | 541-2018-02866 |
| 433-2018-02866 | 520-2016-02974 | 520-2016-02995 | 520-2019-01305 | 541-2018-03431 |
| 433-2018-03485 | 520-2016-02975 | 520-2016-03319 | 520-2019-02106 | 551-2017-01130 |
| 450-2018-06667 | 520-2016-02976 | 520-2016-03391 | 520-2019-02362 | 551-2018-01672 |
| 451-2017-00048 | 520-2016-02978 | 520-2016-03422 | 520-2019-02592 | 560-2016-01229 |
| 451-2018-04006 | 520-2016-02979 | 520-2016-03423 | 520-2020-03595 | 560-2016-01509 |
| 451-2019-00005 | 520-2016-02980 | 520-2017-00068 | 523-2016-00799 | **520-2016-03433** |
| 451-2019-00008 | 520-2016-02982 | 520-2017-00087 | 523-2018-01040 | **520-2017-01225** |
| 451-2019-00136 | 520-2016-02984 | 520-2017-00203 | 523-2018-01319 | **541-2016-01553** |
| 510-2016-03889 | 520-2016-02986 | 520-2017-00818 | 523-2018-01980 | **520-2016-03392** |
| 510-2017-02206 | 520-2016-02990 | 520-2017-00983 | 525-2018-01267 | |
| 510-2019-00820 | 520-2016-02992 | 520-2017-01501 | 531-2016-02066 | |
| 520-2016-02972 | 520-2016-02993 | 520-2018-04032 | 541-2015-01642 | |

On behalf of the U.S. Equal Employment Opportunity Commission ("Commission"), I issue the following determination on the merits of the subject charge filed under the Age Discrimination in Employment Act (ADEA) of 1967, as amended, Respondent IBM is an employer within the meaning of the ADEA. All requirements for coverage have been met.

Charging Parties allege they and a class of similarly situated individuals were discharged based on their age. Individual Charging Parties also alleged discrimination based on national origin, sex, race, retaliation, and disability.

Respondent denies discriminating against Charging Parties. Respondent asserts that Charging Parties were discharged as part of a series of Resource Actions designed to reduce headcounts and decrease costs. Respondent contends there was no centralized decision-making, and that each individual manager was responsible for selecting individuals in his or her group that would be laid

off. Respondent offered various reasons for selection for layoff including performance, relevant skills, utilization, and consolidation of services.

The Commission's investigation reveals that Respondent conducted Resource Actions analyzed by the EEOC between 2013 and 2018 that had an adverse impact on employees in the protected age group (PAG). The investigation uncovered top-down messaging from Respondent's highest ranks directing managers to engage in an aggressive approach to significantly reduce the headcount of older workers to make room for Early Professional Hires. Analysis shows it was primarily older workers (85.85%) in the total potential pool of those considered for layoff. Evidence uncovered older employees who were laid off and told that their skills were out of date, only to be brought back as contract workers, at a lower rate of pay with fewer benefits. EEOC received corroborating testimony from dozens of witnesses nationwide supporting a discriminatory animus based on age. See above for a list of Charge Numbers covered by this Determination.

Based on the above, Respondent's asserted defense does not withstand scrutiny and the Commission has determined that there is reasonable cause to believe that Respondent has discriminated against Charging Parties and others on account of their age.

Based on the above, the evidence obtained during the investigation was insufficient to establish a violation of Title VII of the Civil Rights Act of 1964, as amended, and Title I of the Americans with Disabilities Act of 1990, as amended, based on national origin, sex, race, retaliation, and disability.

This determination is final. The ADEA requires that, if the Commission determines that there is reasonable cause to believe that violations have occurred, it shall endeavor to eliminate the alleged unlawful employment practices by informal methods of conference, conciliation, and persuasion. Having determined that there is reason to believe that violations have occurred, the Commission now invites Respondent to join with it in an effort toward a just resolution of this matter.

Disclosure of information obtained by the Commission during the conciliation process may only be made in accordance with the ADEA and the Commission's Procedural Regulations.

A commission representative will contact each party in the near future to begin conciliation. If you decline to enter into conciliation discussions, or when the Commission's representative is unable to secure an acceptable conciliation agreement, the Director shall so inform the parties, advising them of the court enforcement alternatives available to aggrieved persons and the Commission.

On behalf of the Commission:

**Judy Keenan**

Digitally signed by Judy Keenan
DN: cn=Judy Keenan, o=ENFORCEMENT, ou=EEOC/FOR,
email=ARLEAN.NIETO@EEOC.GOV, c=US
Date: 2020.09.03 13:46:48 -04'00'

Date  _____

_____
Judy Keenan, Director
New York District Office

**EXHIBIT G**

 **PROPUBLICA**

**AGE DISCRIMINATION**

# Federal Watchdog Launches Investigation of Age Bias at IBM

After a ProPublica story spotlighting IBM's practices in shedding older workers, the U.S. Equal Employment Opportunity Commission consolidated age discrimination complaints against the company from around the country.

by Peter Gosselin, May 17, 5 a.m. EDT



*Richard Borge, special to ProPublica*

The U.S. Equal Employment Opportunity Commission has launched a nationwide probe of age bias at IBM in the wake of a ProPublica investigation *<https://features.propublica.org/ibm/ibm-age-discrimination-american-workers/>* showing the company has flouted or outflanked laws intended to protect older workers from discrimination.

More than five years after IBM stopped providing legally required disclosures to older workers being laid off, the EEOC's New York district office has begun consolidating individuals' complaints from across the

country and asking the company to explain practices recounted in the ProPublica story, according to ex-employees who've spoken with investigators and people familiar with the agency's actions.

"Whenever you see the EEOC pulling cases and sending them to investigations, you know they're taking things seriously," said the agency's former general counsel, David Lopez. "I suspect IBM's treatment of its later-career workers and older applicants is going to get a thorough vetting."

EEOC officials refused to comment on the agency's investigation, but a dozen ex-IBM employees from California, Colorado, Texas, New Jersey and elsewhere allowed ProPublica to view the status screens for their cases on the agency's website. The screens show the cases being transferred to EEOC's New York district office shortly after the March 22 publication of ProPublica's original story, and then being shifted to the office's investigations division, in most instances, between April 5 and April 10.

The agency's acting chair, Victoria Lipnic, a Republican, has made age discrimination a priority. The EEOC's New York office won a settlement last year <https://www.propublica.org/article/restaurant-chain-settles-age-bias-case-for-12-million> from Kentucky-based national restaurant chain Texas Roadhouse in the largest age-related case as measured by number of workers covered to go to trial in more than three decades.

IBM did not respond to questions about the EEOC investigation. In response to detailed questions for our earlier story, the company issued a brief statement, saying in part, "We are proud of our company and its employees' ability to reinvent themselves era after era while always complying with the law."

Just prior to publication of the story, IBM issued a video recounting its long history of support for equal employment and diversity. In it, CEO Virginia "Ginni" Rometty said, "Every generation of IBMers has asked 'How can we in our own time expand our understanding of inclusion?'"

ProPublica reported in March that the tech giant, which has an annual revenue of about $80 billion, has ousted an estimated 20,000 U.S. employees ages 40 and over since 2014, about 60 percent of its American job cuts during those years. In some instances, it earmarked money saved by the departures to hire young replacements in order to, in the words of one internal company document, "correct seniority mix."

ProPublica reported that IBM regularly denied older workers information the law says they're entitled to in order to decide whether they've been victims of age bias, and used point systems and other methods to pick older workers for removal, even when the company rated them high performers.

In some cases, IBM treated job cuts as voluntary retirements, even over employees' objections. This reduced the number of departures counted as layoffs, which can trigger public reporting requirements in high enough numbers, and prevented employees from seeking jobless benefits for which voluntary retirees can't file.

In addition to the complaints covered in the EEOC probe, a number of current and former employees say they have recently filed new complaints with the agency about age bias and are contemplating legal action against the company.

Edvin Rusis of Laguna Niguel, a suburb south of Los Angeles, said IBM has told him he'll be laid off June 27 from his job of 15 years as a technical specialist. Rusis refused to sign a severance agreement and hired a class-action lawyer. They have filed an EEOC complaint claiming Rusis was one of "thousands" discriminated against by IBM.

If the agency issues a right-to-sue letter indicating Rusis has exhausted administrative remedies for his claim, they can take IBM to court.

"I don't see a clear reason for why they're laying me off," the 59-year-old Rusis said in an interview. "I can only assume it's age, and I don't want to go silently."

Coretta Roddey of suburban Atlanta, 49, an African-American Army veteran and former IBM employee, said she's applied more than 50 times to return to the company, but has been turned down or received no response. She's hired a lawyer and filed an age discrimination complaint with EEOC.

"It's frustrating," she said of the multiple rejections. "It makes you feel you don't have the qualifications (for the job) when you really do."

***Correction, May 17, 2018:*** *This article originally misspelled Coretta Roddey's name.*

**Filed under:** Civil Rights *<https://www.propublica.org/topics/civil-rights>*, Labor *<https://www.propublica.org/topics/labor>*

### Peter Gosselin

Peter Gosselin joined ProPublica as a contributing reporter to cover aging, having previously covered the U.S. and global economies for, among others, the Los Angeles Times. During the first Obama term, he was chief speechwriter to the treasury secretary and later an economic adviser to the original team implementing the Affordable Care Act.

✉ peter.gosselin@propublica.org   ⬛ Peter Gosselin

# EXHIBIT H

**The New York Times** | https://www.nytimes.com/2022/02/12/business/economy/ibm-age-discrimination.html

# *Making 'Dinobabies' Extinct: IBM's Push for a Younger Work Force*

Documents released in an age-discrimination case appear to show high-level discussion about paring the ranks of older employees.

 **By Noam Scheiber**

Feb. 12, 2022

In recent years, former IBM employees have accused the company of age discrimination in a variety of legal filings and press accounts, arguing that IBM sought to replace thousands of older workers with younger ones to keep pace with corporate rivals.

Now it appears that top IBM executives were directly involved in discussions about the need to reduce the portion of older employees at the company, sometimes disparaging them with terms of art like "dinobabies."

A trove of previously sealed documents made public by a Federal District Court on Friday show executives discussing plans to phase out older employees and bemoaning the company's relatively low percentage of millennials.

The documents, which emerged from a lawsuit contending that IBM engaged in a yearslong effort to shift the age composition of its work force, appear to provide the first public piece of direct evidence about the role of the company's leadership in the effort.

"These filings reveal that top IBM executives were explicitly plotting with one another to oust older workers from IBM's work force in order to make room for millennial employees," said Shannon Liss-Riordan, a lawyer for the plaintiff in the

case.

Ms. Liss-Riordan represents hundreds of former IBM employees in similar claims. She is seeking class-action status for some of the claims, though courts have yet to certify the class.

Adam Pratt, an IBM spokesman, defended the company's employment practices. "IBM never engaged in systemic age discrimination," he said. "Employees were separated because of shifts in business conditions and demand for certain skills, not because of their age."

Mr. Pratt said that IBM hired more than 10,000 people over 50 in the United States from 2010 to 2020, and that the median age of IBM's U.S. work force was the same in each of those years: 48. The company would not disclose how many U.S. workers it had during that period.

A 2018 article by the nonprofit investigative website ProPublica documented the company's apparent strategy of replacing older workers with younger ones and argued that it followed from the determination of Ginni Rometty, then IBM's chief executive, to seize market share in such cutting-edge fields as cloud services, big data analytics, mobile, security and social media. According to the ProPublica article, based in part on internal planning documents, IBM believed that it needed a larger proportion of younger workers to gain traction in these areas.

In 2020, the Equal Employment Opportunity Commission released a summary of an investigation into these practices at IBM, which found that there was "top-down messaging from IBM's highest ranks directing managers to engage in an aggressive approach to significantly reduce the head count of older workers." But the agency did not publicly release evidence supporting its claims.

The newly unsealed documents — which quote from internal company emails, and which were filed in a "statement of material facts" in the lawsuit brought by Ms. Liss-Riordan — appear to affirm those conclusions and show top IBM executives specifically emphasizing the need to thin the ranks of older workers and hire more younger ones.

"We discussed the fact that our millennial population trails competitors," says one email from a top executive at the time. "The data below is very sensitive — not to be shared — but wanted to make sure you have it. You will see that while Accenture is 72% millennial we are at 42% with a wide range and many units falling well below that average. Speaks to the need to hire early professionals."

"Early professionals" was the company's term for a role that required little prior experience.

Another email by a top executive, appearing to refer to older workers, mentions a plan to "accelerate change by inviting the 'dinobabies' (new species) to leave" and make them an "extinct species."

A third email refers to IBM's "dated maternal workforce," an apparent allusion to older women, and says: "This is what must change. They really don't understand social or engagement. Not digital natives. A real threat for us."

Mr. Pratt, the spokesman, said that some of the language in the emails "is not consistent with the respect IBM has for its employees" and "does not reflect company practices or policies." The statement of material facts redacts the names of the emails' authors but indicates that they left the company in 2020.

Both earlier legal filings and the newly unsealed documents contend that IBM sought to hire about 25,000 workers who typically had little experience during the 2010s. At the same time, "a comparable number of older, non-Millennial workers needed to be let go," concluded a passage in one of the newly unsealed documents, a ruling in a private arbitration initiated by a former IBM employee.

Similarly, the E.E.O.C.'s letter summarizing its investigation of IBM found that older workers made up over 85 percent of the group whom the company viewed as candidates for layoffs, though the agency did not specify what it considered "older."

The newly unsealed documents suggest that IBM sought to carry out its strategy in a variety of ways, including a policy that no "early professional hire" can be included in a mass layoff in the employee's first 12 months at the company. "We are

not making the progress we need to make demographically, and we are squandering our investment in talent acquisition and training," an internal email states.



Previously sealed documents show IBM executives bemoaning the company's relatively low percentage of millennials.  David Paul Morris/Bloomberg

The lawsuit also argues that IBM sought to eliminate older workers by requiring them to move to a different part of the country to keep their jobs, assuming that most would decline to move. One internal email stated that the "typical relo accept rate is 8-10%," while another said that the company would need to find work for those who accepted, suggesting that there was not a business rationale for asking employees to relocate.

And while IBM employees designated for layoffs were officially allowed to apply for open jobs within the company, other evidence included in the new disclosure suggests that the company discouraged managers from actually hiring them. For example, according to the statement of material facts, managers had to request approval from corporate headquarters if they wanted to move ahead with a hire.

Several of the plaintiffs in a separate lawsuit brought by Ms. Liss-Riordan appeared to have been on the receiving end of these practices. One of them, Edvin Rusis, joined IBM in 2003 and had worked as a "solution manager." He was informed by the company in March 2018 that he would be laid off within a few months. According to his legal complaint, Mr. Rusis applied for five internal positions after learning of his forthcoming layoff but heard nothing in response to any of his applications.

Mr. Pratt, the spokesman, said that the company's efforts to shield recent hires from layoffs, as well as its approach to relocating workers, were blind to age, and that many workers designated for layoffs did secure new jobs with IBM.

The ProPublica story from 2018 identified employees in similar situations, and others who were asked to relocate out of state and decided to leave the company instead.

The company has faced other age discrimination claims, including a lawsuit filed in federal court in which plaintiffs accused the company of laying off large numbers of baby boomers because they were "less innovative and generally out of touch with IBM's brand, customers and objectives." The case was settled in 2017, according to ProPublica.

In 2004, the company agreed to pay more than $300 million to settle with employees who argued that its decision in the 1990s to replace its traditional pension plan with a plan that included some features of a 401(k) constituted age discrimination.

The federal Age Discrimination in Employment Act prohibits discrimination against people 40 or over in hiring and employment on the basis of their age, with limited exceptions.

The act also requires companies to disclose the age and positions of all people within a group or department being laid off, as well as those being kept on, before a worker waives the right to sue for age discrimination. Companies typically require such waivers before granting workers' severance packages.

But IBM stopped asking workers who received severance packages to waive their right to sue beginning in 2014, which allowed it to cease providing information about the age and positions of workers affected by a mass layoff.

Instead, IBM required workers receiving a severance package to bring any discrimination claims individually in arbitration — a private justice system often preferred by corporations and other powerful defendants. Mr. Pratt said the change was made to better protect workers' privacy.

While some former employees preserved their ability to sue IBM in court by declining the severance package, many former employees accepted the package, requiring them to bring claims in arbitration. Ms. Liss-Riordan, who is running for attorney general of Massachusetts, represents employees in both situations.

The particular legal matter that prompted the release of the documents in federal court was a motion by one of the plaintiffs whose late husband had signed an agreement requiring arbitration, and whose arbitration proceeding IBM then sought to block.

IBM argued that the plaintiff sought to pursue the claim in arbitration after the window for doing so had passed, and that some of the evidence the plaintiff sought to introduce was confidential under the arbitration agreement. The plaintiff argued that those provisions of the arbitration agreement were unenforceable.

The judge in the case, Lewis J. Liman, has yet to rule on the merits of that argument. But in January, Judge Liman ruled that documents in the case, including the statement of material facts, should be available to the public.

IBM asked a federal appellate court to stay Judge Liman's disclosure decision, but a three-judge panel of the U.S. Court of Appeals for the Second Circuit rejected the company's argument, and the full circuit court also declined to grant a stay. The New York Times filed an amicus brief to the circuit court arguing that the First Amendment applied to the documents in question.

**Noam Scheiber** is a Chicago-based reporter who covers workers and the workplace. He spent nearly 15 years at The New Republic magazine, where he covered economic policy and three presidential campaigns. He is the author of "The Escape Artists."

---

A version of this article appears in print on , Section B, Page 1 of the New York edition with the headline: Inside IBM, Plan to Oust Old Workers

**EXHIBIT I**

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| RICHARD LAUDIG, ) | Civil Action No. 1:21-cv-05033-AT |
| ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| INTERNATIONAL BUSINESS ) | |
| MACHINES CORP., ) | |
| ) | |
| Defendant. ) | |

### PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO VACATE AND OPPOSITION TO IBM'S MOTION TO CONFIRM ARBITRATION AWARD

## I.    INTRODUCTION

Plaintiff Richard Laudig's motion to vacate presents the Court with an

extraordinary case where a party fraudulently withheld critical evidence in

arbitration to unfairly obtain dismissal of a statutory age discrimination claim.  On

March 4, 2022, Defendant International Business Machines Corp. ("IBM") filed an

opposition to Plaintiff's motion to vacate arbitration award and cross-moved to

confirm arbitration award.  See Dkts. 15, 17.  IBM argues that Plaintiff's motion to

vacate "fails to cite any specific statutory basis for vacatur under the FAA" and

that "Plaintiff does not even try to explain how any specific statutory criteria for

1

vacatur could be satisfied." Dkt. 15 at 1. IBM is wrong. Plaintiff's motion

expressly identifies the "fraudulent conduct and undue means" (grounds for

vacatur under 9 U.S.C. §10(a)) by which IBM obtained dismissal of Plaintiff's

statutory claims:



See Dkt. 1. IBM flatly misled Plaintiff and the Arbitrator in stating that corporate

planning documents pertaining to companywide strategies or plans to change the

demographics of IBM's workforce did not exist. See Dkt. 1 at ¶¶ 22-24. IBM

fraudulently withheld these documents from Plaintiff, despite knowing they existed

and having produced them in another matter involving similar allegations of

systemic age discrimination at IBM. See Id. at ¶¶ 37-39 (explaining that IBM and

its counsel knew of the existence of these documents and falsely claimed they did

not exist). IBM's opposition overlooks the specific factual and legal grounds in

Plaintiff's motion. Indeed, a careful review of IBM's papers reflects that IBM

largely ignores its inappropriate behavior in arbitration, and IBM's arguments

2

reflect a lack of appreciation for the seriousness of the issues at hand.  IBM

tellingly failed to address a significant decision recently issued concerning the

critical evidence that IBM fraudulently withheld from Plaintiff in arbitration.  See

Lohnn v. Int'l Bus. Machines Corp., 2022 WL 36420 (S.D.N.Y. Jan. 4, 2022).  See

also Dkt. 9 (notice of supplemental authority).  As explained in Lohnn, the court

there recently carefully scrutinized the documents that IBM withheld from Richard

Laudig in this case and determined that they are "**directly relevant**" to identical

Age Discrimination in Employment Act ("ADEA") claims against IBM.  Id. at *12

(emphasis added).  Indeed, the Court concluded that (the same withheld documents

at issue here) **"on their face appear to show an effort to remove older**

**employees in favor of younger employees."** Id. at *6.  (emphasis added).

IBM's fraudulent conduct and undue means **alone** warrant vacatur.

However, where IBM argues that its withholding of evidence is irrelevant because

the Arbitrator refused to hear evidence produced by IBM in Langley v.

International Business Machines, Corp., (W.D. Tex.) (see Dkt. 16 at 23) – evidence

that *would have resulted in the production of the critical documents at issue* and

shed light on IBM's false statements to the Arbitrator ‑ IBM only provides further

support for Plaintiff's motion to vacate.  See Dkt. 1 at ¶ 5 (explaining that

██████████████████████████████████████

████████████

IBM also argues that Plaintiff's motion is procedurally improper because it was titled as a "petition to vacate," despite the Eleventh Circuit clearly holding that the type of "nomenclature" that IBM complains of should not prevent this Court from ruling on the merits of Plaintiff's motion. See O.R. Sec., Inc. v. Pro. Plan. Assocs., Inc., 857 F.2d 742, 746 (11th Cir. 1988) ("The liberality of the ... Federal Rules is such that an erroneous nomenclature does not prevent the court from recognizing the true nature of a motion" and the District Court did not err by construing a "complaint" to vacate an arbitration award as a motion where the papers by "both parties submitted to the district court adequately briefed the issue of whether the arbitration award in question should have been vacated.") (citation and internal quotation marks omitted). IBM's procedural arguments are especially weak in this case. Plaintiff filed a notice of supplemental authority, prior to the filing of IBM's opposition brief, that made clear that Plaintiff himself understood his "petition" to be construed as a "motion" (see Dkt. 9 at 1, expressly referring to Dkt. 1 as a "Motion to Vacate") and IBM also responded to Plaintiff's pleading by filing an opposition to his motion. There is no reason not to decide Plaintiff's motion to vacate on the merits.

4

At bottom, IBM's opposition to Plaintiff's motion to vacate and IBM's cross-motion to confirm the arbitration award are not supported by sound arguments based in the unique record here. IBM instead shows no remorse or recognition of the seriousness of its conduct in arbitration.[1] As explained further below, Plaintiff's motion to vacate the arbitration award should be granted and IBM's motion to confirm should be denied.

## II.    ARGUMENT

### A.    Plaintiff has satisfied the Section 10(a)(1) standards articulated in Bonar

IBM recognizes that vacatur is proper under Section 10(a) of the FAA "[w]here the award was procured by corruption, fraud, or undue means." 9 U.S.C. § 10(a)(1). IBM incorrectly argues that Plaintiff has failed to satisfy the following three-part test articulated by the Eleventh Circuit in Bonar v. Dean Witter Reynolds, Inc., 835 F.2d 1378, 1383 (11th Cir. 1988):

1. The movant must establish the fraud by clear and convincing evidence;
2. The fraud must not have been discoverable upon the exercise of due diligence prior to or during the arbitration; and

---

[1]    IBM's lack of contrition or recognition of the wrongfulness of its conduct and the impact such conduct had on Plaintiff's ability to effectively vindicate his rights in arbitration supports the need to vacate the arbitration award at issue. It cannot possibly be the law that a party can withhold shockingly incriminating evidence in arbitration and then argue that the Federal Arbitration Act provides no remedy. Certainly, Plaintiff recognizes that it is generally difficult to obtain vacatur of an arbitration award. Yet, this is no ordinary case and accepting IBM's arguments would render much of the FAA's vacatur statute superfluous.

3. The person seeking to vacate the award must demonstrate the fraud materially related to an issue in arbitration.

Moreover, the third "element does not require the movant to establish that the result of the proceedings would have been different had the fraud not occurred." Id.

Here, Plaintiff has easily satisfied each Bonar factor. First, IBM indisputably made false statements to the Arbitrator and Plaintiff in claiming the key categories of documents requested in discovery do not exist. See Dkt 1 at ¶ 24, ███████████████████████████████████████

███████████████ Second, Plaintiff expressly requested the documents at issue and diligently moved to compel such categories of documents but did not receive them because of IBM's fraudulent and undue litigation conduct. Dkt 1 at ¶ 22-24. Third, as recently held in Lohnn, the documents at issue "on their face" are material to the claims at issue and "directly relevant" to the case. 2022 WL 36420, at *6, *12.

### i.    Plaintiff has indisputably established that IBM withheld key evidence in arbitration

IBM's argument boils down to its insistence that its egregious conduct in arbitration does not rise to the level of fraudulent conduct. However, IBM does not and cannot dispute that it withheld the documents at issue here and falsely claimed they did not exist – nor can IBM dispute that it knew of the existence of

6

these documents and produced them in another similar matter where IBM was represented by the same counsel. Accordingly, the question is not whether Plaintiff has submitted evidence that IBM withheld key evidence, but whether IBM's egregious conduct was sufficiently fraudulent and destructive of the arbitral process to require vacatur here. It was. IBM engaged in a calculated effort to withhold key documents that would dramatically impact Plaintiff's ability to engage in discovery and present his case to the Arbitrator.

Over the past three and a half years, Plaintiff's counsel has been litigating and arbitrating age discrimination claims against IBM challenging its illegal companywide practices and policies to target and eliminate older employees from the workplace in order to make room for "millennial" employees and build a younger workforce. **Now, after IBM obtained dismissal of Laudig's case on summary judgment, counsel have become aware that IBM has made false representations to Plaintiff and the Arbitrator to improperly obtain this result.** Indeed, Plaintiff's counsel has recently uncovered shocking documents showing the extraordinary lengths IBM has gone to in order to conceal incredibly incriminating evidence at the heart of Plaintiff's case.

The documents that Laudig's counsel have uncovered show IBM executives' direct age animus, as well as targeted plans to reduce the numbers of older employees and increase the number of younger employees across the company.

7

These documents should have been produced at the outset of this case. IBM's

failure to produce this highly relevant evidence is a striking abuse of the discovery

and arbitral process.

### ii.    Plaintiff diligently requested the withheld evidence at issue and IBM falsely claimed such documents did not exist

Following dismissal of Laudig's claims, Plaintiff learned that IBM has

improperly withheld documents



IBM did not

produce any documents responsive to these requests. Laudig moved to compel

IBM to produce such documents (along with several other categories of

documents).

See █████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████

It has now become clear that IBM's representations about the non-existence of such documents *were false*, as Plaintiff's counsel has since learned of (after IBM had Plaintiff's claim dismissed) ████████████████████████ ████████████████████████████████ In another matter involving similar allegations of systemic age discrimination, IBM produced documents that are *specifically* contemplated ██████████████████████ ████████████████████████████████████████████ Moreover, IBM was aware of the existence of these documents *at the time that Plaintiff requested those documents in this case*.[2]

---

[2]    On September 27, 2021, after Plaintiff's case was dismissed and his motion for reconsideration denied, Laudig's counsel obtained a subset of the documents that IBM produced in <u>Townsley, et al. v. IBM</u>, Case No. 20-cv-00969-LY (W.D. Tex.). ████████████████████████████████████████████ ████████████████████████████ a fact IBM has not disputed.

As set forth in the Plaintiff's Statement of Material Facts in <u>Lohnn</u> (attached hereto as Ex. 1),[3] these documents show direct evidence of age discrimination at IBM and demonstrate that IBM knew its layoff programs were targeting older workers. <u>See</u> <u>Id.</u> at ¶¶ 22-36. Specifically, the executive emails that IBM withheld from Laudig demonstrate as follows:

- IBM executives exchanged emails making clear IBM wanted to see the percentage of "millennials" employed at IBM increased. <u>Id.</u> at ¶ 26.
- In one email chain, an IBM executive expresses frustration that IBM's proportion of millennials employees is much lower than at a competitor firm. She forwards an article to another executive, which she points out "says 72% of ACN ee's are millenials [sic]." The recipient of the email responds, stating "Last year, millennials made up 42% of our workforce and 81% of new hires . . . . we can refresh the numbers for YTD 2016-and see what makes sense to use in future opps." The IBM executive replies: "42 is a far cry from 72." <u>Id.</u> at ¶ 27.
- These emails show an IBM executive making clear concerns to her Human Resources team, noting to her team: "at the last OT we discussed the fact that our millennial population trails competitors. The data below is very sensitive – not to be shared – but wanted to make sure you have it. You will see that while Accenture is 72% millennial we are at 42% with a wide range and many units falling well below that average. Speaks to the need to hire early professionals – and to avoid using downbanding of existing employees as a way to fill jobs. Honestly I think we should stop this practice – it means over-paying, creates blockers and inhibits bringing in new thinking from the outside." <u>Id.</u> at ¶ 28.
- Indeed, the withheld emails show that IBM was particularly focused on an analysis of the percentage of millennials in each business unit at IBM. <u>Id.</u> at ¶ 29.

---

[3]    Exhibit 1 is a lightly redacted version of Plaintiff's statement of material facts. As reflected in the Court's order in <u>Lohnn</u>, IBM's efforts to maintain broader redactions to these documents have been rejected.

- An IBM analysis reflected in these emails includes a chart which shows the percentage of employees in various generational cohorts in each business unit. These cohorts identify the proportion of employees who are "millennial", "Gen X", "baby boomers", and "traditionalists". Id. at ¶ 30.
- In another communication, an IBM executive applauds the use of the disparaging term "Dinobabies" to describe the older IBM employees and a plan to oust them from IBM's workforce; the executive describes his plan to "accelerate change by inviting the dinobabies" (new species) to leave" and make them an "Extinct species." Id. at ¶ 32.
- In another email, an IBM executive describes IBM's "*dated maternal workforce – this is what must change*. They really don't understand social or engagement. Not digital natives. *A real threat for us*." Id. at ¶ 33.  (emphasis added).
- In one email, an IBM executive warns her team: "I'm sure you all know this but as a reminder, keep data on age very limited and when in doubt check with legal." Id. at ¶ 34.
- These emails evidence a top-down plan to retain younger workers in an effort to improve IBM's demographic makeup. In one email, an IBM executive explains a "mandatory" rule that "no EPH [Early Professional Hire] is eligible for RA ["resource action" – IBM's term for mass layoff] in first 12 months of hire. We are not making the progress we need to make demographically, and we are squandering our investment in talent acquisition and training." Id. at ¶ 35.
- In another email, an IBM executive explains to that the percentage of millennials at IBM will increase once certain of IBM's "resource action" (layoff) programs are complete: " – more on this issue of % millennials. The math will improve when [laid off] employees move on, and when we bring onboard our early professionals and interns in the summer . . .." Id. at ¶ 36.

*These documents are more than just relevant to the issue of whether IBM engaged in an unlawful scheme to target older workers with "Resource Actions" (IBM's term for layoffs) -- they are highly incriminating.*

There is no question that the documents that Plaintiff's counsel has now seen ███████████████████████████████████████, yet ***IBM outright***

***denied their existence.*** ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████ ***But that, too, was false and misleading.*** Plaintiff's counsel has now

learned that these documents were also produced in <u>Langley</u> and these documents

expressly show IBM executives closely tracking the age demographic information

***in Plaintiff's business group*** and companywide. ████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████ IBM misled

the Plaintiff and Arbitrator throughout this litigation by claiming that all the

documents produced in <u>Langley</u> ████████████████████████████

███████████████████████████████████████████████

██████████████████████

*Based directly on IBM's false statements,* ███████████████

███████████████████████████████ that is at the heart of

his case. This ***direct evidence*** of age discrimination would have changed the

trajectory of this case.

### iii.    The withheld evidence supported Plaintiff's claims "on their face" and are "directly relevant" to his ADEA claims

A federal court has now concluded that the withheld documents at issue here

are "directly relevant" to identical ADEA claims against IBM and demonstrative of

Plaintiff's allegations "on their face." Lohnn, 2022 WL 36420, at *6, *12.

(emphasis added).  Indeed, the Court concluded that (the same withheld documents

at issue here) **"on their face appear to show an effort to remove older**

**employees in favor of younger employees."** Id. at *6.  (emphasis added).

Indeed, Judge Liman of the Southern District of New York has recently described

the withheld documents and they include: "Communications between high-level

IBM executives in which they discussed how the percentage of millennials

employed at IBM trailed that of competitor firms, used a disparaging term to

describe older IBM employees, and described layoffs that would help change the

age distribution of employees at IBM," as well as documents "that discussed a

strategic relocation program that was allegedly used to ensure the resignation of

older employees from the company." See Id. at *12.  More recently, on February

12, 2022, the New York Times reported on this shocking evidence probative of

13

whether IBM executives adopted a scheme to defraud Plaintiff and other similarly situated workers.  See *Making 'Dinobabies' Extinct: IBM's Push for a Younger Work Force, available at* https://www.nytimes.com/2022/02/12/business/economy/ibm-age-discrimination.html (attached hereto as Ex. 2).

IBM's misconduct infected every stage of Plaintiff's case preparation and presentation and far exceeds the threshold to set aside arbitration award.  Justice and fairness demand that this contaminated award against Plaintiff be set aside.  The unfortunate facts here present the Court with precisely the circumstances where vacatur should be granted.  See Bonar v. Dean Witter Reynolds, Inc., 835 F.2d 1378, 1385 (11th Cir. 1988) (vacating an arbitration award and holding that the Court's opinion was supported by its precedent applying Rule 60 which involves a standard analogous to the vacatur standard); Young v. Act Fast Delivery of W. Virginia, Inc., 2019 WL 4859009, at *3 (S.D.W. Va. Oct. 1, 2019) (granting Rule 60(b)(3) motion where defendant "deliberately concealed evidence through misleading and false responses to discovery requests" and where the information and "data concealed by [defendant] was important to the case.").  Indeed, IBM's litigation "strategy centered on arguments and narratives made possible by its own misconduct." Id. at *4. See also Cap Exp., LLC v. Zinus, Inc., 996 F.3d 1332, 1342 (Fed. Cir. 2021) (affirming Rule 60(b)(3) relief where defendant's president

14

and expert witness misrepresented knowledge of key facts); Rozier v. Ford Motor Co., 573 F.2d 1332, 1346 (5th Cir. 1978) ("the district court abused its discretion in denying plaintiff's Rule 60(b)(3) motion" where "Ford completely sabotaged the federal trial machinery, precluding the 'fair contest'" and engaged in the "selective disclosure of information."); Abrahamsen v. Trans-State Exp., Inc., 92 F.3d 425, 429 (6th Cir. 1996) (Rule 60(b)(3) relief was warranted where defense "counsel prevented the Plaintiffs from fully and fairly presenting their case" because false testimony was given and defendant's counsel did nothing to correct the record, thus "show[ing]contempt for the rules of discovery and violat[ing] the trust placed in counsel to obey the fundamental rules of court.").

It is remarkable that IBM withheld these documents from Laudig in his case and vacatur is warranted under these extraordinary circumstances. IBM's assertions that there was no evidence of higher-level age animus or a companywide scheme of removing older employees in favor of younger employees *was only able to obtain the Arbitrator's acceptance in this action because IBM withheld this direct evidence.* IBM "deliberately concealed evidence through misleading and false responses to discovery requests." Young, 2019 WL 4859009, at *3. Had IBM produced these documents as required, the entire trajectory of this arbitration would have been altered.

15

a.    The Arbitrator's order granting summary judgment to IBM was made without the benefit of this improperly withheld evidence

While the Eleventh Circuit has been clear that the standard for vacatur under Section 10(a) "does not require the movant to establish that the result of the proceedings would have been different had the fraud not occurred," Bonar, 835 F.2d at 1383, it is clear that IBM's conduct unjustly colored every aspect of Plaintiff's arbitration. IBM's misstatements to Plaintiff and this Arbitrator regarding the purported non-existence of key documents █████████████

████████████████████████████████████████████████████

█████████████████████████████ led to Laudig being deprived of this *direct evidence* of age discrimination. At ███████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████ But had Laudig had access to and been able to introduce the smoking gun evidence of age discrimination referenced above, Laudig would not only easily have established pretext (*or at a minimum*, shown there are questions of fact requiring a full hearing), but he also would not have needed to prove his case through the McDonnell Douglas burden-shifting framework at all. See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 511 (2002) ("[I]f a plaintiff is able to produce direct evidence of discrimination, he may prevail without proving all

16

the elements of a prima facie case.").

Rather, the direct evidence of age discrimination that Plaintiff references above would have determinatively shown the Arbitrator that IBM implemented its Resource Actions, including the one that impacted Lauidg, to effectuate its scheme to reduce the headcount of older workers in order to hire millennials in large numbers. The Fourth Circuit has recognized exceedingly similar evidence as constituting direct evidence of age discrimination:

> The plaintiffs introduced ample direct evidence suggesting that Blue Bell fired them because of their ages. This direct evidence of age discrimination consisted of testimony relating how various Blue Bell officials had indicated an intent to replace older salesmen with younger salesmen. For example . . . Kogut testified that in September or October 1981 Wise conceded that he believed that "younger salesmen do a much better job than older salesmen." App. at 580. According to Kogut, Wise further stated that "in the not too distant future, all Wrangler salesmen would be young, college boys driving leased Chevrolets, taking inventory on big Wrangler accounts."

Wilhelm v. Blue Bell, Inc., 773 F.2d 1429 1433-34 (4th Cir. 1985), 475 U.S. 1016 (1986). Wilhelm is still regularly cited by Fourth Circuit courts. See, e.g., Wilson v. Nash Edgecombe Economic Development, Inc., 2020 WL 5594538 *10 (E.D.N.C. Sept. 18, 2020); Ikome v. CSRA, LLC, 2019 WL 3253391 *5 (D. Md. Jul. 19, 2019).

In addition to the Fourth Circuit, an overwhelming majority of other Circuit Courts of Appeal, **including the Eleventh Circuit**, have similarly held that evidence showing a systemic bias toward hiring younger workers constitutes clear

17

evidence of age discrimination. See, e.g., Rowell v. BellSouth Corp., 433 F.3d

794, 798 (11th Cir. 2005) (an age discrimination plaintiff can "present

circumstantial statistical evidence regarding age; or evidence that the employer's

plan was subterfuge for discrimination, such as evidence that an employee-

rotation plan existed which shifted protected workers into jobs most likely to be

cut in the reduction in force."); Rheinfeldt v. Ingersoll-Rand De Puerto Rico., Inc.,

2021 WL 2177059 (1st Cir. May 28, 2021) (finding that high level statements

made by the employer regarding its efforts to "rejuvenate" its workforce constitute

**direct evidence** of age-based animus); Ercegovich v. Goodyear Tire & Rubber

Co., 154 F. 3d 344, 356 (6th Cir. 1998) ("Discriminatory statements may reflect a

cumulative managerial attitude among the defendant-employer's managers that

has influenced the decisionmaking process for a considerable time. Thus,

management's consideration of an impermissible factor in one context may

support the inference that the impermissible factor entered into the decision-

making process in another context."); Mangold v. California Public Utilities

Comm'n, 67 F. 3d 1470, 1474-75 (9th Cir. 1995) (finding substantial evidence

supported finding of ADEA liability, in part based on statements made by the

president's comments in a speech, that the employer was "going into a bright new

future in which we have an excellent staff of young professional people who will

be able to carry us into this bright new future by virtue of their superb education

18

and training."); <u>Forsyth v. HP, Inc.</u>, 2020 WL 2524517, *8 (N.D. Cal. May 18, 2020) (plaintiffs sufficiently alleged disparate treatment ADEA claim, based on allegations that HP President "implemented a five-year workforce restructuring initiative" designed to push out older workers to make room for younger workers, and "was vocal about her desire to recruit and hire young people); <u>Palasota v. Haggar Clothing</u>, 342 F.3d 569, 573 (5th Cir. 2003) ("Palasota produced further evidence that Haggar's management was concerned with the appearance of its aging sales force" including a statement by company president "that he wanted 'race horses' and not 'plow horses'").

At bottom, IBM was able to convince the Arbitrator that Plaintiff could not meet his burden, while withholding direct evidence of the discriminatory scheme at issue in this matter. This direct evidence shows discriminatory motive, undermines IBM's alleged business justification, and shows that IBM's entire (dishonest) defense to this action is merely another chapter in IBM's shameful coverup of its discrimination.

## B.  Vacatur is also warranted under Section 10(a)(3)

In opposing, IBM argues that the withheld documents at issue are immaterial because ████████████████████████████████████████████ ████████████████████████████████ IBM's own arguments support an alternative basis for vacatur since IBM concedes that the Arbitrator refused to hear

evidence that a federal judge recently referred to as "directly relevant" to the claims at issue. See Lohnn, 2022 WL 36420, at *12. Accordingly, the Arbitrator refused to hear evidence pertinent and material to the controversy, which is grounds to vacate the award. See 9 U.S.C. § 10(a)(3); see also Hoteles Condado Beach, La Concha and Convention Center v. Union de Tronquistas Local 901, 763 F.2d 34, 40 (1st Cir. 1985); Tempo Shain Corp. v. Bertek, Inc., 120 F.3d 16, 19-20 (2d Cir. 1997). Likewise, the refusal to compel production of pertinent evidence constitutes a refusal "to hear evidence" within the meaning of the FAA. See, e.g., Universal Computer Sys., Inc. v. Big Bell 21, LLC, 2014 WL 12603178 at *4 (S.D. Tex. Jan. 29, 2014) ("The failure to ensure that relevant documentary evidence is made available to an opposing party constitutes a violation of Section 10(a)(3) when a party can show resultant prejudice.").

The Arbitrator's broad and categorical refusals to afford Plaintiff access to essential evidence for proving his case deprived Plaintiff of the opportunity to fully present his claims, provide evidence to overcome the Motion for Summary Disposition, and proceed to a full hearing on the merits of his claims. These denials constitute a refusal to hear "pertinent and material" evidence under the FAA and warrant vacatur here. However, the Court need not decide whether the Arbitrator refused to hear evidence if the Court grants Plaintiff's primary argument that IBM engaged in fraudulent conduct destructive of the arbitral process in the

20

first instance – a separate and independent ground for vacatur.[4] See 9 U.S.C. §
10(a)(1).

### C.    IBM's procedural objections to Plaintiff's motion to vacate are unavailing

IBM argues that the Court should deny Plaintiff's motion as procedurally

improper because he captioned it as a "petition to vacate" instead of a "motion to

vacate" or a "petition and motion to vacate." IBM's arguments are contrary to

Eleventh Circuit authority and unpersuasive as applied to the unique facts of this

case. See O.R. Sec., Inc. v. Pro. Plan. Assocs., Inc., 857 F.2d 742, 746 (11th Cir.

1988) ("The liberality of the ... Federal Rules is such that an erroneous

nomenclature does not prevent the court from recognizing the true nature of a

motion" and the District Court did not err by construing a "complaint" to vacate an

arbitration award as a motion where the papers by "both parties submitted to the

district court adequately briefed the issue of whether the arbitration award in

question should have been vacated.") (citation and internal quotation marks

omitted).

The truth is that Plaintiff had long understood the "petition to vacate" to

constitute both the initiation of this action via the federal court filing system **and**

---

[4]    **Indeed, had IBM not made false statements to the Arbitrator in furtherance of IBM's scheme to fraudulently withhold evidence, the Arbitrator may have viewed the entire case differently in view of the withheld evidence.**

the underlying motion to vacate. IBM itself has construed it as a motion and has filed a response in opposition instead of an answer. IBM's procedural argument is largely a distraction from the extraordinary circumstances that required Plaintiff Laudig to seek relief from this Court. Plaintiff's filing has all the components of a motion, including articulating the factual and legal bases for the requested relief, submitting numerous exhibits in support of the motion, and citing to caselaw supporting Plaintiff's arguments. See, e.g., Dkt. 1 at 12, n. 3 (collecting cases). IBM was on fair notice regarding the grounds for vacatur and it has instead largely sought to ignore or downplay the evidence submitted by Plaintiff to this Court.

## III.    CONCLUSION

For foregoing reasons, Plaintiff's motion to vacate the arbitration award should be granted and IBM's cross-motion to confirm the award should be denied.

Respectfully Submitted,

RICHARD LAUDIG,

By his attorneys,

*/s/ Shannon Liss-Riordan*
Shannon Liss-Riordan, *pro hac vice*
Zachary Rubin, *pro hac vice*
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
(617) 994-5800
Email: sliss@llrlaw.com
zrubin@llrlaw.com

James Radford
(GA Bar No. 108007)
RADFORD & KEEBAUGH, LLC
315 W. Ponce de Leon Ave, Suite 1080
Decatur, GA 30030
Email: james@decaturlegal.com

Dated:          April 1, 2022

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 1st day of April 2022, a copy of the foregoing

document was filed electronically through the Court's CM/ECF system, which will

send notice of this filing to all counsel of record.

*/s/ Shannon Liss-Riordan*
Shannon Liss-Riordan
